638 F.2d 1061
 1980-81 Trade Cases 63,714, 8 Fed. R. Evid. Serv. 74
 CONTRACTOR UTILITY SALES CO., INC., an Illinois corporation,
Plaintiff Counterdefendant-Appellant,
v.
CERTAIN-TEED PRODUCTS CORPORATION, a Maryland corporation,
Defendant Counterplaintiff-Appellee.
CONTRACTOR UTILITY SALES CO., INC., an Illinois corporation,
Plaintiff Counterdefendant-Appellee,
v.
CERTAIN-TEED PRODUCTS CORPORATION, a Maryland corporation,
Defendant Counterplaintiff-Appellant.
 Nos. 80-1128, 80-1245.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 16, 1980.
Decided Jan. 14, 1981.
Rehearing and Rehearing In Banc Denied Feb. 17, 1981.
 
 Thomas F. Londrigan, Springfield, Ill., for plaintiff-counterdefendant appellant, plaintiff-counterdefendant appellee.
 Geoffrey G. Gilbert, Chicago, Ill., for defendant-counterplaintiff appellee, defendant-counterplaintiff appellant.
 Before CUMMINGS, SPRECHER and BAUER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 Plaintiff, Contractor Utility Sales Co., Inc. ("Cusco"), brought suit against Certain-teed Products Corporation ("Certain-teed"),[1] for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for common law fraud and breach of contract. A ten day jury trial was held before Judge Harold A. Baker in the United States District Court for the Central District of Illinois. At the close of plaintiff's case, Judge Baker granted Certain-teed's motion for a directed verdict on the antitrust counts. The breach of contract and fraud counts remained and were submitted to the jury, which returned a general verdict for Cusco awarding $2,400,000 in compensatory damages and $7,383,000 in punitive damages. Cusco appeals the district court's directed verdict on the antitrust counts and the court's refusal to grant a new trial on the issue of compensatory damages. Certain-teed appeals several rulings of the court concerning liability and damages on the common law counts. We affirm the district court's directed verdict on the antitrust counts, but reverse and remand for a new trial the issues of liability and damages on the common law breach of contract and fraud counts.
 
 
 2
 * Cusco is a closely held Illinois corporation based in Springfield, Illinois which sells and distributes polyvinylchloride ("pvc") pipe, asbestos cement ("a/c") pipe, and related accessory supply items to contractors involved in what is known as the federally funded rural water market. Ron Lance is Cusco's majority shareholder and key operating officer. Cusco has been a major force in the sale and distribution of pvc and a/c pipe in the Midwest, primarily in Illinois, Indiana, Missouri, Kentucky, Tennessee, Iowa, Nebraska, and Kansas.
 
 
 3
 Certain-teed, a Maryland corporation, manufactures, among other things, pvc and a/c pipe for use in the rural water market. Its corporate headquarters are in Valley Forge, Pennsylvania.
 
 
 4
 The rural water market consists of federally funded projects designed to supply drinking water to rural areas. Independent contractors compete in public bidding for construction of the projects. Pipe manufacturers and distributors generally submit price quotations to independent contractors for the contractors' use in preparing competitive bids. Actual purchases of pipe, either directly from the manufacturer or from independent distributors, occur only after a contractor has been awarded the project. Often, a successful contractor purchases pipe at prices lower than those originally quoted and from suppliers other than the one who provided the lowest quote in the bidding process. In other words, there is price competition among suppliers at the bidding stage and again at the purchase stage. Cusco and Certain-teed concede that the rural water market has been a very competitive market.
 
 
 5
 From 1965 to 1972, Cusco was a distributor/sales agent for Certain-teed's pvc and a/c pipe in the rural water market in parts of Illinois and Indiana. As an adjunct of its pipe business Cusco supplied contractors with a full line of pipe accessories and supplies manufactured by companies other than Certain-teed. During these years Cusco, primarily through the efforts of Lance, developed a lucrative business based upon a loyal clientele of independent contractors who consistently turned to Cusco as their supplier of competitive quotations and, ultimately, of pipe and accessories.
 
 
 6
 In 1972, Cusco terminated its status as sales agent for Certain-teed's pvc pipe and switched to a competing manufacturer, Robintech Inc., who offered Cusco a larger territory (eight states) and a higher commission rate (81/2%). Since Robintech did not manufacture a/c pipe, Cusco continued to sell and distribute Certain-teed's a/c pipe. Although the parties disagree as to Cusco's exact market share during its years with Robintech, Cusco apparently sold between 25% and 35% of all pvc pipe used in the rural water market in Cusco's market area.
 
 
 7
 Beginning in 1969, and finally terminating unsuccessfully in June, 1975, Certain-teed negotiated with Lance in hopes of purchasing Cusco as a company-owned supply house. The final offer of over $3,000,000 in cash and Certain-teed stock was rejected by Lance in June of 1975.
 
 
 8
 By the summer of 1975, Cusco, for a number of reasons,[2] had decided to terminate its relationship with Robintech and to once again handle Certain-teed's pvc pipe, as well as continuing to handle Certain-teed's a/c pipe. Shortly after negotiations for the purchase of Cusco by Certain-teed terminated, the parties began negotiations for a new "Sales Agents Agreement." Lance met with Certain-teed representatives on July 7 and 8, 1975, at Certain-teed's corporate headquarters in Valley Forge. During the course of these negotiations, which produced a draft Sales Agents Agreement, Lance met with Bill Krivsky, head of the Utility Supply Group, Ray Blankenship, head of marketing, George Haufler, President of Certain-teed, and Fred Timpe, financial officer. According to Lance, during these negotiations, Krivsky and others repeatedly assured Lance that Certain-teed would keep Cusco "competitive" in the rural water market.[3]
 
 
 9
 The proposed Sales Agents Agreement was reviewed by James Potter, Cusco's legal counsel; minor changes satisfactory to both parties were made. Lance, on behalf of Cusco, signed the Sales Agents Agreement in Potter's office during the last week of August, 1975. The contract was executed by Certain-teed officials in Valley Forge on September 2, 1975.
 
 
 10
 The Sales Agents Agreement was to begin November 1, 1975, and run through December 31, 1978. It was terminable only upon the mutual consent of the parties or upon the occurrence of certain specified events, such as the insolvency of Cusco or the departure of Lance from active participation in Cusco. Except for sales through existing agents or distributors of Certain-teed, Cusco was designated the exclusive Certain-teed agent for the eight state area Cusco originally had with Robintech. Certain-teed promised to supply Cusco with up to 50,000,000 pounds of pvc pipe per year and to pay Cusco a sales commission of 10% of the invoice price on pvc pipe and 81/2% on a/c pipe. Under the contract, Cusco was to submit to Certain-teed all information regarding projects prior to submitting any quotations or bids to contractors competing for the project contract. Cusco was to quote prices only as established and authorized by Certain-teed. Cusco was not to sell pipe of competing manufacturers without first submitting the bid or order to Certain-teed for its acceptance or rejection. The contract also contained an integration clause specifically stating that:
 
 
 11
 This Agreement contains the entire agreement of CPC (Certain-teed) and Sales Agent (Cusco). Any and all representations, inducements, promises or agreements, oral or otherwise, of CPC and Sales Agent which are not set forth herein, or in a written amendment hereof executed by CPC and Sales Agent, shall not be of any force or effect, and shall not be binding on either CPC or Sales Agent.
 
 
 12
 Shortly after the contract was executed, Certain-teed officials met in St. Louis with Lance, Cusco sales people, Certain-teed field representatives, and Certain-teed corporate officials to explain the contract and to begin the new business association. According to the testimony of Lance and several others, during the course of this meeting Krivsky and other Certain-teed officials again assured the Cusco representatives that Certain-teed intended to keep Cusco "competitive" in the rural water market.
 
 
 13
 The Sales Agents Agreement took effect November 1, 1975. Also during November, 1975, Krivsky, who had negotiated the Cusco agreement for Certain-teed, left the Utility Supply Group and became head of Certain-teed's Pipe Division. On December 31, 1975, Certain-teed announced incremental price increases, commencing January 1, 1976, totalling 25% on its pvc pipe. The immediate impact of this price increase was to price Certain-teed's pipe out of the highly competitive rural water market and to reduce significantly the sale of pipe by Cusco and Certain-teed.
 
 
 14
 To understand the possible reasons for Certain-teed's price increase, a brief analysis of the conditions in the rural water market in 1974, 1975, and 1976 is necessary. 1974 was a boom year in the rural water market for manufacturers, agents, and distributors. The Arab oil embargo had created shortages of pvc pipe, an oil-based product, and had pushed prices and profits to new highs. By 1975, however, the market had reversed and sellers/distributors found themselves with an abundance of pipe at extremely low prices and profits. Lance testified that during June, 1975, pvc prices were as depressed as he had ever seen them. Dr. Roger Kormendi, Cusco's expert on damages, testified that by the end of 1975 prices were so depressed that Certain-teed had earned, what he called, a "negative profit" in its pipe division. The December 31, 1975, price increase, according to Certain-teed, was an attempt by Certain-teed to act as a price leader and to force prices upward to profitable levels.[4] Certain-teed's price leadership proved only partially successful. Although by June, 1976, prevailing market prices had increased by about 25% over the 1975 lows, Certain-teed sales had suffered during the interim.
 
 
 15
 In late 1976, Certain-teed terminated its agency relationships with all existing agents, except Cusco, and entered into new distributorship agreements with the former agents. The new agreements offered commissions to the distributors which were lower than those offered in the terminated agency agreements. Certain-teed offered such a distributorship contract to Cusco, but Cusco steadfastly refused to abandon the apparently more lucrative Sales Agents Agreement. These distribution changes, according to Certain-teed, were part of Certain-teed's efforts to abandon its sales agent force and move towards a much more active direct company sales force. Indeed, during 1976 Certain-teed undertook a number of steps to prepare and enlarge its direct sales force.
 
 
 16
 Cusco now alleges that Certain-teed conspired with competing manufacturers and distributors to eliminate Cusco as an independent sales force in the rural water market, that Certain-teed improperly refused to quote competitive prices to Cusco, that Certain-teed endorsed or permitted dual pricing on numerous bids submitted by Cusco, and that Certain-teed used the Sales Agents Agreement to eliminate Cusco as a competitive market force.
 
 
 17
 The rough and tumble of the parties' business relations finally spilled into the federal courts on June 1, 1977, when Cusco filed the instant action. Cusco's complaint was in two counts. Count I claimed $3,500,000 in compensatory damages for Certain-teed's breach of the Sales Agents Agreement. Count II claimed $3,500,000 compensatory and $3,500,000 punitive damages because Certain-teed allegedly:
 
 
 18
 (I)nduced plaintiff to enter into (the) Sales Agency Agreement ... by fraudulently misrepresenting to the Plaintiff that the Defendant would grant to the Plaintiff an exclusive sales territory and maintain the Plaintiff on the same status as other agents and distributors of the Defendant regarding price, availability of materials, etc.
 
 
 19
 The diversity of the parties was alleged to establish jurisdiction in the district court under 28 U.S.C. § 1332.
 
 
 20
 One year later, on June 16, 1978, Cusco filed its first Amended Complaint, dropping the original common-law counts and asserting three counts for violations of the federal antitrust laws. Count I alleged that Certain-teed unilaterally attempted to monopolize the Midwest rural water market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Count II claimed that the Sales Agents Agreement was a contract in restraint of trade prohibited by § 1 of the Sherman Act, 15 U.S.C. § 1. Count III alleged that Certain-teed's dual pricing policy violated the Robinson-Patman Act, 15 U.S.C. § 13.
 
 
 21
 On March 26, 1979, Cusco filed a Second Amended Complaint in six counts. This complaint dropped the Robinson-Patman Act claim (which previously had been dismissed by agreement of the parties) and the unilateral § 2 attempt to monopolize claim, and asserted five new antitrust counts based on alleged violations of Sections 1 and 2 of the Sherman Act. The complaint, in a less than artful fashion, essentially alleged a conspiracy among Certain-teed, Hayes Pipe and Supply Company, and other distributors to eliminate Cusco and to monopolize the distribution market for pvc pipe. The complaint further alleged that Certain-teed had conspired with Cusco to eliminate Robintech, Certain-teed's competitor/manufacturer, and that the Sales Agents Agreement was an illegal resale price maintenance and market allocation scheme. The restraint of trade count was continued. Count VI again asserted that Certain-teed had induced Cusco to execute the Sales Agents Agreement on the basis of a fraudulent misrepresentation, but the alleged misrepresentation now was described as:
 
 
 22
 (a) The Defendant, Certain-Teed, would grant to the Plaintiff, CUSCO, an exclusive sales territory;
 
 
 23
 (b) That the Defendant, Certain-Teed, would supply to the Plaintiff, CUSCO, 50 million pounds of PVC pipe per year;
 
 
 24
 (c) That the Defendant, Certain-Teed, would keep the Plaintiff, CUSCO, competitive with his contractor-customers in the rural water market.
 
 
 25
 Certain-teed moved on April 10, 1979, to dismiss Cusco's Second Amended Complaint pursuant to Rules 12(b)(6), 15, and 56 of the Federal Rules of Civil Procedure. After a hearing, Judge Ackerman denied this motion. Certain-teed's Petition for a Writ of Mandamus to force Judge Ackerman to dismiss the complaint was denied by this court on June 28, 1979.
 
 
 26
 On September 21, 1979, yet another pleading was filed by Cusco an Amendment to Second Amended Complaint. This pleading modified slightly the fraudulent misrepresentation count and reasserted Cusco's original breach of contract claim.[5] Finally, during the course of the jury trial, Cusco filed a Second Amendment to Second Amended Complaint in order to add certain factual allegations to its existing counts.
 
 
 27
 Several weeks before the November 5, 1979, trial date, Judge Ackerman announced that he was recusing himself from the trial and that Judge Baker would try the case. But, before officially transferring the case to Judge Baker, Judge Ackerman heard and denied Certain-teed's motions for summary judgment or, in the alternative, for a trial continuance. Subsequent motions to Judge Baker requesting his reconsideration of Judge Ackerman's actions were denied.[6]
 
 
 28
 A jury trial was held before Judge Baker from November 5 to November 16, 1979. During the course of Cusco's case, Judge Baker excluded a portion of the damages testimony of Dr. Roger Kormendi, Cusco's expert witness on damages, and instructed the jury accordingly. At the close of Cusco's evidence, Judge Baker granted Certain-teed's motion for a directed verdict on the five antitrust counts and denied a similar motion with respect to the common law counts. The jury returned a general verdict awarding Cusco compensatory damages of $2,400,000 and punitive damages of $7,383,000. Certain-teed's post-trial motions for judgment n. o. v. or, in the alternative, for a new trial were denied. Similarly, Cusco's motion for a new trial on the antitrust counts was denied. Both parties appealed to this court, claiming errors below.
 
 II
 
 29
 Cusco appeals from the district court's directed verdict in favor of Certain-teed on the antitrust counts. Cusco argues that sufficient evidence was introduced to raise a jury question as to (a) whether Certain-teed had violated Section 1 of the Sherman Act by conspiring with others to destroy Cusco's business, and (b) whether the Sales Agents Agreement was an illegal contract in restraint of trade, also prohibited by Section 1 of the Sherman Act.[7]
 
 
 30
 On review of a directed verdict, we are "bound to view the evidence in the light most favorable to (the resisting party) and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962) (footnote omitted). A directed verdict is proper only where the trial court, viewing the evidence and all reasonable inferences arising therefrom in the light most favorable to the resisting party, and without weighing the credibility of witnesses, concludes that no reasonable jury in a fair and impartial exercise of their judgment may arrive at a different conclusion. Hohmann v. Packard Instrument Co., Inc., 471 F.2d 815, 819 (7th Cir. 1973). Having viewed the record in the required manner, we conclude that Cusco failed to establish a prima facie case of any violations of Section 1 of the Sherman Act. Thus, the district court properly granted Certain-teed's motion for a directed verdict.[8]
 
 
 31
 The clearest characterization of Cusco's claims before this Court is the defendant's, namely that Cusco alleges:
 
 
 32
 A) a concerted refusal to sell pipe to Cusco as a result of an agreement reached between Certain-teed and other independent distributors with the purpose of eliminating price competition;
 
 
 33
 B) a conspiracy between Certain-teed, Hayes Pipe and Supply Company, and other distributors to destroy Cusco's business;
 
 
 34
 C) a conspiracy between Certain-teed and other manufacturers of pvc pipe to destroy Cusco's business; and,
 
 
 35
 D) that the Cusco Sales Agents Agreement is a contract in restraint of trade.
 
 
 36
 We deal with each of these allegations seriatim.A
 
 
 37
 Cusco's first antitrust theory relies on this court's recent decision in Alloy International Co. v. Hoover-NSK Bearing Co., 635 F.2d 1222, 1980-1 Trade Cases (CCH), P 63,148 (7th Cir. 1980). There we stated that a Sherman Act § 1 violation could be established if the jury determined that "the defendant manufacturer refused to sell to the plaintiff distributor as a result of an agreement with the latter's competitor aimed at eliminating price competition between the distributors." 635 F.2d at 1224, 1980-1 Trade Cases, P 63,148, at 77,707.[9]
 
 
 38
 Cusco argues that its proof raised a jury question whether Certain-teed had taken action to eliminate Cusco as an independent distributor of its pvc pipe upon the request of one or more competing distributors and motivated by a desire to eliminate Cusco's price competition. But, Cusco misunderstands the requirements of the per se refusal-to-deal theory expressed in Alloy International. Furthermore, its evidence at trial fell far short of establishing either a refusal-to-deal or the existence of any agreement or conspiracy between Certain-teed and its distributors aimed at eliminating Cusco's price competition.
 
 
 39
 Manufacturers generally have broad discretion regarding with whom or through whom they deal. But, Alloy International and Cernuto recognize that this discretion is overstepped when: 1) a manufacturer terminates a dealer upon the request of another dealer and, 2) that termination is motivated by a desire to reduce or eliminate price competition. The reason for this limitation on a manufacturer's discretion is that such conduct contains elements of non-unilateral activity and resembles either a concerted refusal to deal or a price fixing scheme, either of which are per se illegal.
 
 
 40
 Cusco failed to establish that its rocky relations with Certain-teed fit within this theory. Certain-teed terminated Cusco as an agent only after relations had so deteriorated that Cusco withheld approximately $1,000,000 owed to Certain-teed in 1977. Cusco does not allege that this 1977 termination was wrongful. Rather, Cusco argues that Certain-teed improperly recruited Cusco as a Certain-teed agent. But, proof of such improper recruitment, without more, does not constitute sufficient evidence of termination. Indeed, such actions tend to show the opposite: that the agent relationship was not terminated. Certain-teed recruited Cusco to sell its pipe, and Cusco did make sales of Certain-teed pipe. In 1976, Cusco sold a quantity of Certain-teed pvc pipe roughly equivalent to the volume of pipe it sold in 1975 for Robintech.
 
 
 41
 Cusco's theory, although not clearly articulated, must be that Certain-teed's actions towards Cusco during the life of the Sales Agents Agreement are similar, in terms of anticompetitive effects, to the termination of an existing dealer. While individual actions of Certain-teed during the contract period, such as the alleged dual pricing and covert use of Hayes Pipe & Supply Company, may have reduced Cusco's sales volume and produced unacceptable anticompetitive effects, the per se ruling of Alloy International is inapplicable. This case does not involve a complete termination. Cusco continued to sell significant quantities of pvc pipe for Certain-teed during the contract period. Since there is no complete termination appropriate for a per se analysis, Cusco would have to provide a more complex analysis under the rule of reason. But, Cusco has not presented the facts or analysis necessary for such a rule of reason holding and we will not embark upon it sua sponte. Thus, the district court properly rejected Cusco's first antitrust claim premised on Alloy International's theory of wrongful termination.
 
 B
 
 42
 Cusco's second antitrust claim alleges a conspiracy in restraint of trade between Certain-teed, Hayes Pipe & Supply Company ("Hayes"), and other distributors to eliminate Cusco as a competitor in the rural water market. This count fails for lack of evidence of any unlawful conspiracy or combination.
 
 
 43
 Cusco argues forcefully that the business relations between Certain-teed and Hayes during the term of the Sales Agents Agreement demonstrate an unlawful conspiracy. The facts, viewed in the light most favorable to Cusco, establish that Hayes was an independent distributor of Certain-teed pvc pipe in Tennessee. During 1975, the year the Sales Agents Agreement was executed, Hayes marketed approximately 170,000 pounds of Certain-teed pvc pipe in Tennessee. During 1976 and 1977, Hayes' sales increased dramatically to 1.6 million and 5.3 million pounds, respectively. During 1978, the year the Cusco agency agreement was terminated, Hayes' sales in Tennessee dropped to 3.2 million pounds of Certain-teed pvc pipe. During this same period, Cusco's sales in Tennessee dropped substantially. This drop can be seen in comparison to sales of Robintech pipe. In 1975, while Cusco sold Robintech products, Cusco sold approximately 3.4 million pounds of pvc pipe in the Tennessee rural water market. But, under the Certain-teed agreement, Cusco's total sales in 1976 and 1977 in Tennessee were 900,000 and 500,000 pounds, respectively.
 
 
 44
 Cusco argues that this dramatic drop in Cusco's sales in 1976 and 1977, coupled with a simultaneous surge in Hayes' Tennessee sales, is more than mere coincidence. Specifically, Cusco argues that Certain-teed's sales through Hayes were unlawful under the Cusco Sales Agents Agreement. That agreement granted Cusco an exclusive sales agency in Tennessee, and other states, except for "(s)ales through existing agents or distributors of CPC (including those owned by CPC)." Cusco argues that Hayes was not an existing agent or distributor of Certain-teed because it had no written agreement with Certain-teed when the Sales Agents Agreement was executed. Consequently, Cusco argues that the large sales through Hayes evidence Certain-teed's intent to avoid its obligations under the Cusco agreement and its intent to place Cusco in an anticompetitive position in the Tennessee rural water market. Cusco argues that the anticompetitive effects of these unlawful sales are further exacerbated by the preferential prices and delivery terms Certain-teed granted to Hayes, but denied to Cusco.[10]
 
 
 45
 Cusco also puts great weight on a memorandum written by Vic Birch of Certain-teed's Credit Department, dated April 6, 1977. In that memorandum, Birch stated that Hayes had "co-operated" with Certain-teed regarding customer information and "has gone along with my decisions as to what contractor to sell and those to stay away from."
 
 
 46
 Finally, Cusco claims that Certain-teed engaged in a concerted practice of dual pricing aimed at eliminating Cusco as a competitor in the rural water market. According to Cusco, on several occasions Certain-teed authorized Cusco to quote a certain price to a contractor preparing a bid, while at the same time Certain-teed, or agents authorized by Certain-teed, quoted lower prices to the same contractor or to other contractors bidding for that same project.[11]
 
 
 47
 Certain-teed denies that the evidence established that it intended to damage Cusco. Certain-teed argues that Hayes had marketed Certain-teed pipe in Tennessee prior to the Cusco Sales Agents Agreement, that the absence of a written agent/distributor contract did not prohibit continued sales through Hayes, and that one reason Hayes made substantial sales was because Cusco failed to make any serious selling efforts in Tennessee. Although admitting that infrequent instances of discriminatory pricing may have occurred because of inadvertent or unauthorized acts,[12] Certain-teed denies that it ever engaged in purposeful dual pricing aimed at eliminating Cusco as a competitive force. Furthermore, Certain-teed argues that the pricing practices cited by Cusco as examples of dual pricing were not discriminatory, but were the results of competitive bidding in the second stage, or actual purchase point, of the pipe business.[13] Finally, Certain-teed argues that Cusco failed to establish any evidence of an unlawful conspiracy aimed at eliminating Cusco. Certain-teed contends that the conduct Cusco relies upon to establish a Section 1 claim is purely unilateral and, thus, cannot constitute a Section 1 violation.
 
 
 48
 We agree, and find that Cusco failed to establish a prima facie case of an unlawful conspiracy to eliminate Cusco as a competitor. The evidence establishes, at most, unilateral actions by Certain-teed.
 
 
 49
 Section 1 of the Sherman Act prohibits contracts, combinations, or conspiracies unreasonably restraining trade or commerce. The fundamental prerequisite is unlawful conduct by two or more parties pursuant to an agreement, explicit or implied. Solely unilateral conduct, regardless of its anti-competitive effects, is not prohibited by Section 1. Rather, to establish an unlawful combination or conspiracy, there must be evidence that two or more parties have knowingly participated in a common scheme or design to accomplish an anti-competitive purpose. Albrecht v. Herald Co., 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). Wisconsin Liquor Co. v. Park & Tilford Distillers Corp., 267 F.2d 928, 931 (7th Cir. 1959).
 
 
 50
 An agreement to engage in anti-competitive conduct need not, and generally will not, be established by direct evidence of a combination or conspiracy. The requisite concerted action may be inferred from a course of dealing or from other circumstantial evidence. American Tobacco Co. v. United States, 328 U.S. 781, 809-10, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575 (1946); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 472, 83 L.Ed. 610 (1939). United States v. Consolidated Packaging Corp., 575 F.2d 117, 126-27 (7th Cir. 1978).
 
 
 51
 Although Section 1 does not require production of a smoking gun in order to establish an unlawful conspiracy, we certainly cannot fault the district court for granting a directed verdict where the plaintiff fails to produce even a puff of smoke indicating that such a gun existed and was used. Cusco's evidence established only that Certain-teed unilaterally performed a number of activities and that those activities may have had anti-competitive effects.[14]
 
 
 52
 First, Certain-teed's reliance on Hayes to sell pvc pipe in Tennessee does not evidence the requisite elements of an unlawful conspiracy. John Selleck, Certain-teed's district manager for Tennessee, testified for Cusco that Hayes had sold Certain-teed pipe prior to September, 1975, and that, although Hayes did not have a written distributor/agent agreement, Certain-teed continued to negotiate with Hayes in hopes of securing such an agreement. The Cusco Sales Agents Agreement's exception for existing agents and distributors did not specify that "existing agents" was limited to those with written agreements. Thus, we cannot conclude that Certain-teed's sales through Hayes constituted a breach of the agreement. Since we cannot conclude that Certain-teed breached the agreement, we cannot conclude that the sale through Hayes necessarily is evidence of an unlawful conspiracy.
 
 
 53
 Second, since the sales through Hayes were lawful, the fact that Hayes' sales increased while Cusco's decreased does not establish that Certain-teed unlawfully conspired with Hayes to damage Cusco. Certain-teed was free to deal either through Cusco or through its pre-existing agents such as Hayes. Even proof that Certain-teed chose to market through Hayes because Certain-teed held anti-competitive motives towards Cusco would be insufficient to prove a conspiracy. Cusco must further prove that Hayes encouraged or participated in this decision for anti-competitive reasons. Otherwise, the sales through Hayes evidence nothing more than unilateral action by Certain-teed. That Hayes benefitted from Certain-teed's decision does not, without some evidence of participation, establish an unlawful conspiracy. Fuchs Sugar & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025, 1031 (2d Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). Moreover, Cusco failed to show any improper motive or participation by Hayes or Certain-teed. The testimony of Selleck indicated that Certain-teed's decision to market primarily through Hayes was a legitimate business decision taken in light of Cusco's disappointing sales efforts in Tennessee and the advantages offered by a local agent such as Hayes.[15]
 
 
 54
 Third, the Birch memorandum, standing by itself, certainly does not evidence an unlawful conspiracy. It simply recounts the normal cooperation between a manufacturer and an agent dealing with sometimes shaky contractors on large volume credit transactions. Certain-teed's selling arrangement resulted in the extension of credit to contractors. There is nothing insidious about a memo recounting the cooperation between a manufacturer and his legitimate agent distributor.
 
 
 55
 Finally, Cusco's reliance on the alleged preferential terms granted to Hayes and the alleged dual pricing engaged in by Certain-teed similarly falls short of establishing an unlawful conspiracy to restrain trade. Even assuming arguendo that the allegations are true, there is nothing to indicate that the actions are anything more than the unilateral business decisions of Certain-teed. That Hayes benefitted from the preferential business terms does not establish it as a co-conspirator. There is no evidence that Hayes acted with knowledge of any unlawful actions taken by Certain-teed with regard to Cusco.[16]
 
 
 56
 Cusco also argues that Certain-teed conspired with agents and distributors other than Hayes to eliminate Cusco. Cusco relies primarily upon the testimony of Eugene Grose, the owner of a Kansas City distributorship handling Certain-teed pvc pipe during 1976, who testified: that he believed that the Cusco Sales Agents Agreement was a better arrangement that he and other Certain-teed distributors and agents had; that because of Cusco's preferred agent status, Cusco could be more competitive in the rural water market than he could be; that he spoke with numerous other Certain-teed distributors and agents regarding the unfairness and competitive threat of the Cusco arrangement; that, in the spring of 1976, he spoke about the Cusco arrangement with Ralph Gray, Certain-teed's St. Louis district manager, who expressed his reservations about the Cusco agreement; and, that at the American Water Works Association (AWWA) convention in 1976, he and other Certain-teed distributors complained to Krivsky and other Certain-teed officials about the unfairness of the Cusco arrangement.
 
 
 57
 But, this evidence again falls short of establishing an unlawful conspiracy. Indeed, the unequivocal testimony of Grose on cross-examination destroys any possibility that these conversations were a part of a conspiracy against Cusco. During cross-examination, Grose explicitly denied that he or other distributors ever requested Certain-teed to terminate Cusco or to take any other action that would harm Cusco. He only asked Certain-teed that he too be given an agents agreement as lucrative and competitive as the Cusco Sales Agents Agreement. He further stated that the conversations at the AWWA convention were similar pleas by distributors for treatment comparable to Cusco's, and that Certain-teed never stated that any action would be taken into injure or terminate Cusco.[17] Such unequivocal denials of conspiracy by the plaintiff's best witness, and the absence of any other evidence indicating the presence of a Certain-teed distributor conspiracy, supports the district court's conclusion that there was no jury question regarding whether any of Cusco's competitors had requested Certain-teed to terminate or injure Cusco.[18]C
 
 
 58
 Cusco's third antitrust theory alleges an unlawful conspiracy between Certain-teed and other manufacturer/distributors of pvc pipe aimed at eliminating Cusco from the rural water market. Cusco presents two strands of evidence to establish this claim. First, Cusco relies primarily upon the testimony of Clayton Walker, President of Vinylplex, a competitor-manufacturer, regarding a conversation with Certain-teed's Bill Krivsky about distribution techniques. Second, Cusco asserts that the testimony of Ron Lance regarding his difficulties in securing an alternative supply of pipe buttresses this claim.
 
 
 59
 Walker testified[19] that he preferred direct sales, that Krivsky agreed there was a need for direct marketing, and that Walker was reluctant to sell pipe through Cusco. This testimony hardly established that Certain-teed conspired with Vinylplex or others to eliminate Cusco. There is no evidence that Krivsky and Walker agreed to any course of action that would violate the Sherman Act. The conversation merely reveals Vinylplex's reasons for its direct sales force and Krivsky's agreement that the competitive rural water market required direct sales. No unified course of action was agreed upon or contemplated.[20] The manufacturers were acting for their own independent self-interests in turning to direct sales to the exclusion of middlemen such as Cusco.
 
 
 60
 The second strand of Cusco's industry-wide conspiracy theory is even weaker than the first. Cusco tries to establish such a conspiracy by the self-serving testimony of Lance that other manufacturers "hated" him because of his aggressive competition in the past, and that their subsequent refusal to sell him pipe on a regular basis (after the Certain-teed agreement collapsed) is evidence of their concerted action against him. We fail to see how this, without more, is any evidence of an industry-wide conspiracy. Even assuming the other manufacturers, individually, do despise him and did refuse to sell regularly through him, those actions do not establish a conspiracy. We have, at most, unilateral business judgments regarding distribution techniques taken by individual competitors. A concerted refusal to deal would be actionable, but evidence of the requisite element of concerted action clearly is missing in Cusco's case.[21] Thus, the directed verdict on this count was proper.D
 
 
 61
 Cusco's final antitrust theory is that the Cusco Sales Agents Agreement constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. But, Cusco's argument consists solely of a number of allegations, often conclusory and inconsistent, offered repeatedly without supporting legal analysis. The ensuing discussion, consequently, deals only briefly with what we believe is Cusco's major argument.
 
 
 62
 Cusco apparently claims the Sales Agents Agreement constituted an unreasonable restraint of trade because it imposed certain vertical restraints on Cusco to the detriment of Cusco and competing pvc pipe manufacturers. Cusco does not focus on any one element of the contract but alleges that the combination of the three year term, Certain-teed's right of first refusal for quotations submitted to contractors, and Certain-teed's authority to approve prices for bids submitted through Cusco, resulted in substantially reduced competition in the Midwest rural water market.
 
 
 63
 We begin our analysis by recognizing that the propriety of these alleged vertical restraints under the Sherman Act must be determined according to a "rule of reason" analysis. Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).[22] With this test in mind, we agree with the district court that Cusco failed to demonstrate that the Sales Agents Agreement unreasonably foreclosed competition from a substantial portion of the relevant market.
 
 
 64
 We begin with a brief look at the rural water market. According to Cusco's own admissions, the rural water market was, and still is, a highly competitive market consisting of several major manufacturers, numerous smaller pipe producers, numerous independent and manufacturer-controlled sales agents, and countless contractor customers. Cusco's role, prior to 1975, was that of a relatively successful middleman: it acted as a distributor or agent for the distribution of Robintech's pvc pipe and Certain-teed's a/c pipe. After the effective date of the Sales Agents Agreement, Cusco became an agent primarily for Certain-teed. Cusco, for several years, had sold about 25% of the pvc pipe used in the rural water market.
 
 
 65
 Cusco's arguments about foreclosure of this 25% market share are confusing. On the one hand, Cusco claims that as a result of the Sales Agents Agreement, Certain-teed's competitor-manufacturers were foreclosed from this 25% of the market allegedly held by Cusco. This apparently was so because Cusco had a number of loyal customers who relied solely on Cusco to provide competitive quotations and, ultimately, pipe. Thus, Cusco argues, the shift by Cusco to Certain-teed foreclosed these customer contacts. We cannot agree with Cusco's logic.
 
 
 66
 First, prior to the Certain-teed Sales Agents Agreement, Cusco distributed only Robintech pvc pipe. The Sales Agents Agreement merely was a shift by Cusco from one manufacturer to another. Accepting for the moment Cusco's argument about foreclosure, other manufacturers were foreclosed from Cusco's loyal customer contacts under either agreement. And, more importantly, we do not see that the agreement itself foreclosed any competition in the rural water market. All pipe manufacturers and contractors were free to deal with one another. Any "foreclosure" with respect to contractors loyal to Cusco resulted from Cusco's sales ability, not from the Sales Agents Agreement with Certain-teed.
 
 
 67
 Second, Cusco's evidence regarding diminished sales of pipe following Certain-teed's price increase undermines any argument claiming that the Sales Agents Agreement effectively foreclosed other manufacturers from a substantial portion of the market. We assume Cusco's and Certain-teed's diminished market shares following the price increases were the result of increased sales by other manufacturers. Thus, we conclude that the Agreement did not unreasonably foreclose any competing manufacturers of pipe.
 
 
 68
 On the other hand, Cusco apparently asserts that under the Sales Agents Agreement it was unreasonably foreclosed from a substantial portion of the market. We cannot agree. The Sales Agents Agreement established Cusco as the agent for Certain-teed. Certain-teed's retention of pricing authority is a reasonable requirement of an agency distribution system. The relative exclusivity of the agreement Cusco was free to quote competing manufacturers' prices only after Certain-teed refused to act is not unreasonable. We conclude that Cusco failed to prove any substantial foreclosure resulting from the Sales Agents Agreement.
 
 
 69
 In our opinion, Cusco's real problem was not the Sales Agents Agreement, but was the shifting nature of the pipe business in the rural water market. The 1973 oil shortage caused a shake-up in the pipe business. Depressed profits forced pipe manufacturers to streamline their distribution techniques in order to maintain acceptable profit levels. Certain-teed sought to survive by altering its agency relationship and by allying itself with Cusco and its sales strength. Unfortunately, market forces did not allow this marriage to thrive. By the time the Cusco Certain-teed relation had ended, other manufacturers had shifted their distribution systems into direct sales. Consequently, there was little need for Cusco's middleman capabilities. Thus, the problems Cusco encountered were more a matter of economic reality than of antitrust violations.
 
 
 70
 For all of the foregoing reasons, we hold that Cusco failed to establish a prima facie case for violation of Section 1 of the Sherman Act. Consequently, the district court's directed verdict as to the antitrust counts was proper.
 
 III
 
 71
 The breach of contract count and fraud count were submitted to the jury with a general verdict form. That form required the jury to set forth, 1) the amount of compensatory damages due to Cusco if the jury found that Certain-teed had committed either violation alleged, and 2) the amount of punitive damages, if any, if the jury found that Certain-teed had committed fraud. Since the jury awarded punitive damages, we assume they concluded that Certain-teed had committed fraud. Although we have no way of knowing for sure, we assume, for purposes of this opinion, that the jury found for Cusco on the breach of contract count as well.
 
 
 72
 Both parties appeal from the jury verdict awarding Cusco damages totalling approximately $9.7 million dollars on the fraud and breach of contract claims. Cusco argues that the damages award is insufficient. Certain-teed argues that any finding of liability is erroneous as a matter of law, or, in the alternative, that prejudicial errors of the trial court require a new trial. Surprisingly, both parties present meritorious arguments which require us to vacate the judgment and remand the controversy for a new trial.A
 
 
 73
 Cusco's breach of contract claim, as submitted to the jury, is twofold: 1) that Certain-teed breached the oral condition of the Sales Agents Agreement that Certain-teed would keep Cusco "competitive" in the rural water market, and 2) that Certain-teed breached the implied obligation to deal fairly and in good faith with Cusco.
 
 
 74
 Certain-teed argued below, and renews that argument here, that the Pennsylvania parol evidence rule[23] precludes admission of any testimony aimed at varying, modifying, or adding to the written, integrated Sales Agents Agreement freely negotiated and executed by the parties. The district court initially agreed with Certain-teed's position and instructed the jury that the testimony of Lance and others regarding the alleged oral representations by Certain-teed officials during negotiations which culminated in the Sales Agents Agreement were to be disregarded for purposes of the breach of contract action. The court instructed the jury to consider the testimony only for purposes of the fraud and antitrust counts. But, when submitting the case to the jury, the district court reversed its position. It ruled that such oral representations could be considered by the jury for the contract claim. We believe the district court incorrectly applied the complex and confusing Pennsylvania parol evidence rule with respect to the breach of contract count.
 
 
 75
 Although the Pennsylvania parol evidence rule is somewhat unclear, Pennsylvania courts consistently have applied the rule in breach of contract actions to preclude admission of testimony aimed at altering integrated written contracts freely negotiated by the parties. In Bardwell v. Willis Co., Inc., 375 Pa. 503, 100 A.2d 102, 104 (1953), the Pennsylvania Supreme Court explained the role of the parol evidence rule as follows:
 
 
 76
 Where the alleged prior or contemporaneous oral representations or agreements concern a subject which is specifically dealt with in the written contract, and the written contract covers or purports to cover the entire agreement of the parties, the law is now clearly and well settled that in the absence of fraud, accident or mistake the alleged oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence.
 
 
 77
 (footnote omitted)
 
 
 78
 The Court emphasized that the rule could not be avoided by a mere allegation that the prior oral representation was fraudulently made. Rather, the Court held that "(f)raudulent misrepresentations may be proved to modify or avoid a written contract if it is averred and proved that they were omitted from the (complete) written contract by fraud, accident or mistake." Id. (emphasis in original).
 
 
 79
 The Pennsylvania Supreme Court consistently has followed the rule announced in Bardwell. See Nicolella v. Palmer, 432 Pa. 502, 248 A.2d 20, 22-23 (1968); McWilliams v. McCabe, 406 Pa. 644, 179 A.2d 222, 228-29 (1962); Sokoloff v. Strich, 404 Pa. 343, 172 A.2d 302, 305-06 (1961); Penn-Allen Broadcasting Co. v. Traylor, 389 Pa. 490, 133 A.2d 528, 532-33 (1957); see also, National Cash Register Co. v. Modern Transfer Co., Inc., 224 Pa.Super. 138, 302 A.2d 486, 488 (Super.Ct.1973).[24]
 
 
 80
 Cusco does not allege,[25] and the evidence certainly does not support, indeed, it contradicts, any finding that Certain-teed's alleged oral representation to quote Cusco competitive prices within one or two percentage points of the prevailing market price was excluded from the Sales Agents Agreement as a result of fraud, accident, or mistake. At the outset, we are confronted by the explicit provision of the written agreement stating that the agreement represents the entire agreement of the parties and that all other representations, inducements, promises, or agreements not contained therein are of no force or effect. Furthermore, the provisions of the agreement granting Certain-teed exclusive control over pricing, with no reference to market prices, clearly are contrary to the alleged oral representation limiting Certain-teed to competitive prices determined by market forces.
 
 
 81
 Finally, the Cusco Sales Agents Agreement was not a form contract forced upon Cusco. It was carefully negotiated between Lance, the president of Cusco, and various key Certain-teed officials over the course of two months in 1975. Drafts of the agreement were reviewed by Lance and by Potter, Cusco's attorney. Certain amendments suggested by Cusco were incorporated into the final agreement, but Cusco took no exception to the pricing provisions. These provisions clearly do not limit Certain-teed to the pricing restrictions contained in the alleged oral representations.
 
 
 82
 Cusco argues in its Reply Brief that testimony regarding the alleged prior oral representations is admissible under an exception to the Pennsylvania parol evidence rule for testimony necessary to explain the terms of a written agreement. Cusco relies on Consolidated Tile and Slating Co. v. Fox, 410 Pa. 336, 189 A.2d 228, 230 (1963), which held that "if the language of a contract is ambiguous, parol testimony is admissible to aid in its construction." But the other cases Cusco cites in support of its argument are the very cases that compel us to reject its argument. Both Dunn v. Orloff, 420 Pa. 492, 218 A.2d 314 (1966), and United Refining Co. v. Jenkins, 410 Pa. 126, 189 A.2d 574, 578-79 (1963), held that parol evidence of prior representations is admissible to explain or modify a written agreement only in limited situations. Such testimony is admissible 1) where it is clearly demonstrated that the agreement "was not intended to and did not properly state the entire agreement between the parties," Dunn, 218 A.2d at 316, or 2) where the prior oral representation was excluded from the written agreement because of fraud, accident, or mistake.
 
 
 83
 In the present case, the Sales Agents Agreement, on its face, is clear and complete. Cusco cannot, under the guise of interpreting the pricing provisions, seek to alter drastically the written contract.[26] Second, there is no evidence that the Sales Agents Agreement was not intended to or does not represent the complete agreement of the parties.
 
 
 84
 For the above reasons, we hold that the district court erroneously admitted testimony aimed at establishing the alleged oral representation as a part of the written, integrated contract freely and fairly negotiated and executed by the parties. Our holding requires us to vacate the judgment below with respect to the contract count. But, we hold that the breach of contract claim, on remand, may be submitted to the jury solely on the issue of Certain-teed's possible breach of its implied obligation to deal with Cusco fairly and in good faith.
 
 B
 
 85
 Certain-teed attacks on several grounds the jury finding of fraud. Cusco's fraud count, as submitted to the jury, alleged that Certain-teed had falsely and fraudulently misrepresented that it would quote competitive prices to Cusco. Certain-teed argues, first, that as a matter of Pennsylvania law, fraud cannot be premised on, what it characterizes as, a mere broken promise of future conduct.[27]
 
 
 86
 We agree that Pennsylvania law does not recognize a cause of action for fraud stemming from a misrepresentation of future intentions. Pennsylvania law requires that fraud consist of a misrepresentation of a past or existing fact. See Sokoloff v. Strich, 404 Pa. 343, 172 A.2d 302, 304 (1961); Neale v. American Motorists Fire Ins. Co., 185 Pa.Super. 60, 138 A.2d 290, 291 (1958); American Empire Ins. Co. v. Hanover Nat'l Bank of Wilkes Barre, 409 F.Supp. 459, 465 (M.D.Pa.), affd without op., 556 F.2d 564 (3d Cir. 1976). But, we do not read Pennsylvania law as an absolute bar to Cusco's fraud claim. Recent Pennsylvania decisions have held that a misrepresentation of future conduct or intention, if false when made, is a misrepresentation of an existing fact. Brentwater Homes, Inc. v. Weibley, 471 Pa. 17, 369 A.2d 1172, 1175 (Pa.1977); College Watercolor Group, Inc. v. William H. Newbauer, Inc., 468 Pa. 103, 360 A.2d 200, 206 (1976).
 
 
 87
 Cusco alleges that at the time Certain-teed made the oral representation to provide Cusco with competitive prices, Certain-teed had no intention of doing so. The testimony of Krivsky, and implications drawn from various Certain-teed internal planning documents, indicates that at the time Certain-teed was negotiating, the Sales Agents Agreement, Certain-teed intended to pursue a policy of higher prices and shifting distribution patterns, with a potentially damaging effect on Cusco and other agents. In light of this evidence we cannot rule that, as a matter of law, Cusco is precluded from asserting a cause of action for fraudulent misrepresentation.
 
 
 88
 Certain-teed contends, as its second argument, that the Pennsylvania parol evidence rule precludes admission of testimony regarding the alleged oral representation since that representation is explicitly denied force and effect under the integration clause of the Sales Agents Agreement. Although the Pennsylvania law is less than clear,[28] our research indicates that Pennsylvania courts do not hold the parol evidence rule to bar introduction of evidence that a contract was fraudulently induced. See Rempel v. Nationwide Life Ins. Co., Inc., 471 Pa. 404, 370 A.2d 366, 370 (1977); Nat'l Bldg. Leasing, Inc. v. Byler, 252 Pa.Super. 370, 381 A.2d 963, 965 (Pa.Super.1977). See also Miller v. Bare, 457 F.Supp. 1359, 1365 (W.D.Pa.1978). The district court correctly admitted Lance's testimony regarding the alleged oral representations, but the testimony should be limited solely to the fraud action.
 
 
 89
 Certain-teed next argues that, even if this testimony is not barred by the parol evidence rule and is a misrepresentation upon which a fraud claim may rest, Cusco failed to carry its burden of proof. Pennsylvania law requires that one asserting fraud present evidence of the fraud that is "clear, precise and convincing." Brentwater Homes, Inc. v. Weibley, 471 Pa. 17, 369 A.2d 1172 (1977). It is also true that the determination of whether the evidence satisfies this threshold test is a question of law for the court. Highmont Music Corp. v. J. M. Hoffmann Co., 397 Pa. 345, 155 A.2d 363, 366 (1959); Greenwood v. Kadoich, 239 Pa.Super. 372, 357 A.2d 604, 606 (Pa.Super.1976).
 
 
 90
 We are satisfied that Cusco met the "clear, precise, and convincing" threshold burden, thus justifying submission of the fraud claim to the jury. Lance testified that during negotiations leading to the execution of the Sales Agents Agreement, and immediately thereafter, Certain-teed officials repeatedly assured him that Certain-teed would provide Cusco with competitive prices for pvc pipe. Cusco also introduced Certain-teed's internal documents concerning the acquisition of Cusco. These documents indicate that, at the time the Cusco contract was negotiated, Certain-teed contemplated a major shift in marketing strategy that would result in a transition to direct sales, obviously at the expense of Cusco and other agents. Krivsky testified that during 1975, Certain-teed contemplated a major program of price increases. He also claimed that he discussed this possibility with Lance during their negotiations. We believe the evidence indicating possible fraud is sufficiently specific to raise a jury question as to the true nature of Certain-teed's representations and motives. There was sufficient proof indicating fraud that submission of the controversy to the jury for their resolution of the conflicting claims and testimony was appropriate.
 
 
 91
 Finally, Certain-teed argues that the jury finding of fraud must be reversed because Cusco failed to establish that a person of ordinary prudence would have relied upon the alleged fraudulent oral representation. Certain-teed urges us to hold that, as a matter of law, it is unreasonable for any party to rely upon a prior oral representation when that party subsequently executes a negotiated written contract containing different representations and an integration clause disavowing any prior representation not incorporated in the written agreement. But, we believe that the reasonableness of Cusco's reliance is best decided by the jury which can weigh the various relevant factors such as: the prior relations of the parties, the frequency and nature of the representations, the conflict between the representations and the contract provisions, and the custom within the trade.
 
 C
 
 92
 The final argument we must confront is Certain-teed's contention that the district court improperly excluded from evidence portions of Cusco's original complaint which are relevant to both the breach of contract and fraud claims. Certain-teed attempted, at three points during the trial, to introduce into evidence a portion of Cusco's original complaint which stated that:
 
 
 93
 (T)he Defendant, in order to establish a market with the sales territory dominated by Plaintiff, induced Plaintiff to enter into an exclusive Sales Agency Agreement with the Defendant by fraudulently misrepresenting to the Plaintiff that the Defendant would grant to the Plaintiff an exclusive sales territory and maintain the plaintiff on the same status as other agents and distributors of the Defendant regarding price availability of materials, etc.
 
 
 94
 (emphasis added)
 
 
 95
 Certain-teed claims that this portion of the original, but superseded, complaint should have been admitted as relevant evidence. Certain-teed argues that, if admitted, this evidence would have enabled Certain-teed to refute Cusco's claim, stated in its final complaint, that Certain-teed induced Cusco to execute the Sales Agents Agreement by fraudulently representing that Certain-teed would keep Cusco "competitive with his contractor-customers in the rural water market." Certain-teed also contends that this evidence is relevant to contest Lance's interpretation of the alleged "keep competitive" representation.[29]
 
 
 96
 Cusco claims that no evidence was admitted at trial to dispute Lance's testimony, and, therefore, "even if the first pleading was inconsistent with the latter amended pleadings and did constitute an admission, any error in its refusal was harmless." Cusco Reply Brief at 55. Cusco further claims that only material admissions of fact from superseded pleadings are admissible. Cusco argues that here we have only an omission of the "keep competitive" language in the original complaint and not an inconsistent statement. The district court, however, apparently found some inconsistency:
 
 
 97
 Now a representation that he would be treated the same as other agents is different and inconsistent with evidence or testimony that he would be kept competitive.
 
 
 98
 Tr. IX at 13-14. Yet the court concluded that "the prior pleading is not an admission and the exhibit is refused admission into evidence." Tr. IX at 14. Thus, it appears the district court concluded that, despite the inconsistencies between the pleadings, superseded pleadings are inadmissible. This is incorrect as a matter of law, and, for the reasons explained below, constitutes reversible error.
 
 
 99
 Although prior pleadings cease to be conclusive judicial admissions, they are admissible in a civil action as evidentiary admissions. McCormick, Handbook of the Law of Evidence 633-34 (2d ed. 1974). As noted in Raulie v. United States, 400 F.2d 487, 526 (10th Cir. 1968), quoting Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 32 F.2d 195, 198 (2d Cir.), cert. denied, 280 U.S. 579, 50 S.Ct. 32, 74 L.Ed. 629 (1929):
 
 
 100
 When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent.
 
 
 101
 This court recently held that it was not error for a trial court to allow introduction of portions of the plaintiff's original complaint. Davis v. Freels, 583 F.2d 337, 342 (7th Cir. 1978) ("for the purpose of impeaching Davis' credibility, Freels could properly rely on material admissions by Davis in this original complaint"). The rule of admissibility of a prior pleading was explained more fully by this court in Nisbet v. Van Tuyl, 224 F.2d 66 (7th Cir. 1955). The Nisbet court ruled that, although a prior complaint was not to be considered upon a motion for summary judgment, it would have been admissible at trial had there been a trial.[30]
 
 
 102
 Cusco argues on the basis of Davis and Nisbet that only "material" admissions of fact in superseded pleadings are admissible in evidence. Cusco argues that here we have only an admission by omission in an unverified complaint, and, therefore, not a material admission. We agree, however, with the district court. There happens to be an inconsistency between the affirmative representation in the original complaint, that Certain-teed promised to treat Cusco the same as other Certain-teed agents, and the claim in the final complaint, that Certain-teed promised to keep Cusco "competitive" in the rural water market. Perhaps Cusco can explain away the inconsistency; but that is a matter for trial, not a reason to exclude the evidence. Similarly, the fact that the original complaint is unverified goes to the weight rather than the admissibility of the original complaint.[31]
 
 
 103
 Next, Cusco argues that admissions contained in prior pleadings cannot be considered "material" unless supported by other factual evidence. According to Cusco, there is no other evidence that conflicts with Lance's trial testimony and the Second Amended Complaint characterization. But, we conclude that there is a genuine evidentiary dispute over the content and meaning of the representations allegedly made by Certain-teed. And, we find that whether Certain-teed promised to keep Cusco "competitive" in the rural water market or only promised to treat Cusco the same as other agents was critical to Cusco's fraud claim.
 
 
 104
 Introduction of the prior complaint is an understandable and legitimate means of impeaching Lance's testimony. Cusco cannot claim that the admission in the original complaint is not material in light of Cusco's heavy reliance on the alleged "keep competitive" promise. Cusco may well be able to explain why the alleged representations were characterized in such different terms. But, Certain-teed should be permitted to introduce this portion of the prior pleading and put Cusco to the task of explaining the inconsistency.
 
 
 105
 The district court's refusal to allow introduction of this portion of the original complaint cannot be characterized as harmless error under Rule 103 of the Federal Rules of Evidence. The true characterization of Certain-teed's representations was critical to Cusco's fraud claim. The apparent conflict in Cusco's complaints is material and significant. The exclusion was prejudicial and reversible error.
 
 IV
 
 106
 The parties present several additional issues for review[32] that, in light of our disposition of this case, we need not reach. Consequently, we affirm the district court's directed verdict as to the antitrust counts; we vacate the judgment on the contract and fraud claims; and we remand this case for proceedings consistent with this opinion.
 
 
 107
 Affirmed In Part; Reversed And Remanded In Part.
 
 
 
 [1]
 During the course of the litigation Certain-teed Products Corporation changed its name to Certain-teed Corporation
 
 
 [2]
 Shortly before Cusco entered negotiations with Certain-teed, Robintech secretly hired one of Cusco's best sales people and reduced Cusco's sales area from eight states to five states. Lance was to receive a reduced commission from Robintech on sales by his former salesperson within the three states lost. Other reasons for leaving Robintech apparently included Robintech's failure to provide an adequate field support staff and Cusco's and its customers' continued concerns about the quality of Robintech's pvc pipe
 
 
 [3]
 The meaning and significance of this "keep competitive" representation is hotly disputed by the parties and constitutes the primary issue in this case. It is dealt with in more detail in subsequent portions of this opinion
 
 
 [4]
 Cusco ascribes a very different and sinister motive to Certain-teed's price increase. Cusco alleges that it was a deliberate act aimed at eliminating Cusco from the rural water market
 
 
 [5]
 During the preliminary stages of this lawsuit the parties agreed to dismiss Certain-teed's counterclaims alleging Cusco's improper withholding of monies due Certain-teed and Cusco's tortious interference with Certain-teed's contractual and business relations with its customers
 
 
 [6]
 Certain-teed asserts in this appeal that the jury verdict of 9.7 million dollars somehow is tainted by the failures of Judge Ackerman and Judge Baker to grant Certain-teed's pre-trial motions for summary judgment on the antitrust counts. Certain-teed claims that the confusion created by Cusco's myriad antitrust claims and the testimony of Dr. Kormendi concerning antitrust damages (an estimate of approximately 9.7 million dollars) which subsequently was excluded, taints the jury award
 This court, in Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163, 1166-67 (7th Cir. 1978), cert. denied, 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979), stated that summary judgment in antitrust cases is permissible and sometimes desirable in order to minimize the possibility of vexatious litigation leading to costly and timeconsuming discovery and trial or to coercive settlements. Lupia, however, did not involve a claim that the presence of questionable antitrust claims unfairly prejudiced the defense of remaining claims. In light of our disposition of other matters justifying a new trial on the contract and fraud claims, we decline this opportunity to expand upon our comments in Lupia.
 
 
 [7]
 Cusco states that this is a case involving Sections 1 and 2 of the Sherman Act. Cusco's Second Amended Complaint, as amended, can be read in Counts III and IV as alleging conspiracies to monopolize in violation of Section 2. But, Cusco's arguments on appeal present issues limited solely to the sufficiency of the evidence to establish a jury question as to possible Section 1 violations, specifically a contract in restraint of trade and a conspiracy to restrain trade. Moreover, Cusco's pleadings, proof, and argument fall far short of establishing the prerequisites of a Section 2 violation. Consequently, we address only the Section 1 claim and consider all other possible antitrust claims to be resolved by the district court's directed verdict
 
 
 [8]
 Cusco has gone to great lengths detailing the course of conduct between the parties, but has experienced great difficulty in fitting that conduct into the structure of a Section 1 violation. Cusco's prime failure in its argument seeking to overturn Judge Baker's directed verdict is its inability, even before this Court, to put forth any consistent and coherent theory of the antitrust laws that, supported by the record we have before us, entitles it to relief
 
 
 [9]
 The court's conclusion that such conduct constitutes a per se violation of § 1 was not the ultimate holding of the case, since the court affirmed the jury verdict for the defendant on the ground that even if such conduct could constitute a per se violation, the jury had been adequately instructed to that effect and its verdict for the defendant would not be upset. But, although a decision as to the validity of the antitrust theory advanced in Alloy International was not essential to the court's holding, the court forcefully stated its acceptance of the theory. Alloy International Co. v. Hoover-NSK Bearing Co., 635 F.2d at 1225, 1980-1 Trade Cases P 63,148 at 77,708 n.5 (7th Cir. 1980)
 The Alloy International court relied primarily upon the Third Circuit's opinion in Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979), which held that:
 If Cernuto (the terminated distributor) can prove at trial that United (the manufacturer), Lappin (United's sales representative) and Famous (Cernuto's competitor) conspired to protect Famous from price competition by Cernuto, and that United and Lappin terminated Cernuto at Famous's request and in pursuit of a price related end, then it can prevail on a price-fixing theory notwithstanding its failure to show any impact on competition ....
 595 F.2d at 170.
 Because we find that Cusco has failed to show any unlawful agreement or termination, we again need not reach the merits of the alleged per se theory. But, once again, we accept the theory as more fully articulated in Alloy International, and Cernuto, and hold that a per se violation of § 1 may be established upon proof that a manufacturer terminates its relationship with an existing dealer/distributor/agent if: (1) the termination is at the request of a competing dealer/distributor/agent and, (2) the termination is motivated by a desire to reduce or eliminate price competition for its products.
 
 
 [10]
 In early 1977, Lance learned that Hayes was purchasing pvc pipe from Certain-teed on terms and conditions previously unavailable to Cusco. Evidently, rather than using Hayes as a normal agent for distribution of pipe, Certain-teed had agreed to sell a large quantity of pipe directly to Hayes at prices below those quoted to Cusco, and with the provision that Hayes take delivery of the pipe at a nearby Certain-teed plant. Upon learning of this arrangement, Lance asked Certain-teed to sell pipe to Cusco at similar prices and conditions. Certain-teed refused to do so, claiming the Hayes prices were too low and were unauthorized
 
 
 [11]
 Cusco claims that the higher quotations provided to it were due to Certain-teed's covert decision to add 10% to all market quotations provided Cusco in order to compensate for the 10% commission Cusco was entitled to under the Sales Agents Agreement
 
 
 [12]
 Certain-teed concedes that on 7 of over 200 jobs bid by Cusco discriminatory pricing did occur
 
 
 [13]
 After carefully reviewing the records concerning the alleged dual pricing incidents, we find that the evidence did not establish a pattern or practice of discriminatory pricing
 
 
 [14]
 Cusco's failure to establish the requisite concerted action negates any need for this Court to determine whether the actions Cusco challenges are indeed unlawfully anti-competitive
 
 
 [15]
 Cusco claims that Certain-teed's reliance on Hayes in Tennessee became improper because Certain-teed was contemplating a switch in marketing strategies to direct manufacturer sales. Without concluding that Certain-teed was so motivated, we note that a manufacturer's decision to change a distribution system is not, by itself, prohibited by the Sherman Act. Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025, 1030 (2d Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979)
 
 
 [16]
 Cusco argues that the district court improperly excluded testimony by Lloyd Kizzire, a Cusco salesperson in Tennessee, that would have revealed the conspiratorial connection between Hayes and Certain-teed. In an offer of proof without the jury present, Kizzire testified that at a bid letting in Tennessee during May, 1976, Jinx Hayes of Hayes stated, in response to an inquiry about pipe prices, that Hayes already knew what Cusco's prices were
 The district court ruled that the proffered testimony was inadmissible hearsay and that Cusco failed to satisfy the co-conspirator exception of Rule 801(d)(2) (E) of the Federal Rules of Evidence. We agree with the district court's ruling. In order for hearsay statements to be admissible under Rule 801(d)(2) (E), there must be independent evidence of the existence of a conspiracy. United States v. Santiago, 582 F.2d 1128 (7th Cir. 1978). Cusco argues that the Birch memorandum and the testimony regarding preferential prices were sufficient evidence of an ongoing relationship with anti-competitive aims. But, as the foregoing discussion in the text above holds, Cusco's alleged proof of a conspiracy is simply inadequate, even for purposes of admitting this testimony under Rule 801(d)(2)(E).
 
 
 [17]
 Cusco relies heavily upon the conversation between Eugene Grose and Ralph Gray, where, according to Grose, Gray stated that, "I want to tell you one thing for sure, that it's my goal in life to make sure that he (Lance) doesn't sell any jobs in this area .... We're going to keep him out of this market." Tr. II, at 70. But, Grose's own testimony states that at that time he did not believe Gray
 
 
 [18]
 Cusco's alleged conspiracy between Certain-teed and its distributors is further undermined by the testimony of Grose that he too found that he could not operate profitably and effectively under a distributorship agreement with Certain-teed. We are hard-pressed to discover an alleged conspiracy between independent distributors and Certain-teed where the purpose and effect of the alleged co-conspirators is to destroy the independent distributors
 
 
 [19]
 Walker's testimony concerns a Valley Forge meeting with Krivsky in the spring of 1976, arranged by Lance in order to discuss a purchase of resin by Vinylplex from Certain-teed:
 We discussed general conditions of the pipe business. We discussed overall general economic conditions. We discussed the growth of the market in pipe. One conversation that I recall specifically was that Mr. Krivsky asked me that since Ron and I were such good friends why I didn't sell more pipe to Mr. Lance or hadn't in the past and I pointed out to him that our marketing approach was different than Certain-teed's, that we tried to market because of my experience in the contracting business I tried to market my pipe direct to the contractor in as many cases as we could. And that we did sell some pipe to distributors but it was generally where the distributor stocked the pipe rather than acted as an agent. And that I didn't feel like we could afford to pay being a small company, pay the commissions that the large pipe producers such as Certain-teed and J-M were paying to distributors and agents and that was primarily why we took another marketing approach. And I recall that Mr. Krivsky told me at the time that this was one of the things that he felt like they had to change in their business and that Mr. Lance, although he was an agent and a distributor for Certain-teed, was not good for the business because he dominated the market in terms of customers and that Certain-Teed was forced to pay him a commission that they felt like they could not afford and Mr. Krivsky informed me that it was his intention to eliminate Contractor Utility Sales from the pipe business and that they would go direct.
 Trans. Vol. V, at 109-10.
 
 
 [20]
 The possibility that the Walker-Krivsky conversation is a conspiratorial meeting is seriously diminished when one considers that Walker and Lance were very good friends and that Lance personally arranged this meeting
 
 
 [21]
 An additional difficulty with Cusco's argument is that the refusals by competing pipe manufacturers to sell through Cusco on a regular basis occurred only after the Certain-teed arrangement collapsed. Thus, the subsequent refusals to deal are only remotely relevant to the alleged actions by Certain-teed. Furthermore, we find the subsequent refusals to deal with Cusco were independent business decisions of manufacturers seeking to reduce their selling costs by shifting to direct sales in, what the plaintiff concedes is, a highly competitive market. A volatile and competitive market such as the rural water market inevitably engenders changes, with winners and losers. The losers must prove more than just their loss in order to secure relief under the antitrust laws. See Fuchs Sugars, 602 F.2d at 1030
 
 
 [22]
 The scope of our inquiry is best described in the words of Justice Brandeis in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):
 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 
 
 [23]
 The parties agree, and the court below found, that Pennsylvania's law controls the contract and fraud claims
 
 
 [24]
 Federal courts applying Pennsylvania law similarly have refused admission of testimony to modify integrated written contracts in the absence of proof that the prior oral representation was omitted from the written contract by fraud, accident, or mistake. See e. g., Levin v. Garfinkle, 492 F.Supp. 781 (E.D.Pa.1980); American Empire Ins. Co. v. Hanover Nat'l Bank of Wilkes Barre, 409 F.Supp. 459, 465 (M.D.Pa.), affd. without op., 556 F.2d 564 (3d Cir. 1976)
 
 
 [25]
 We note that any such allegation that the oral representation was fraudulently excluded from the subsequent written contract must be proven by clear, precise, and convincing evidence. Brentwater Homes, Inc. v. Weibley, 471 Pa. 17, 369 A.2d 1172 (1977)
 
 
 [26]
 We agree with Cusco that under Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 390 A.2d 736, 740-41 (1978), evidence of the parties' course of performance is admissible to assist the trier of fact in interpreting a written agreement. But, the testimony concerning the prior oral representations is not comparable to testimony regarding a course of performance and is not admissible on that ground either
 
 
 [27]
 The elements of a claim of fraud are: 1) the defendant made a false representation of a material past or existing fact, 2) the defendant knew the representation was false, 3) the plaintiff justifiably relied on the misrepresentation, and 4) the plaintiff suffered injury as a result of this reliance on the misrepresentation. Thomas v. Seaman, 451 Pa. 347, 304 A.2d 134, 137 (1973); Glanski v. Ervine, --- Pa.Super. ---, 409 A.2d 425, 430 (1979)
 
 
 [28]
 The confusing and evolving nature of the Pennsylvania parol evidence rule is analyzed carefully and intelligently in several recent opinions of the Superior Court of Pennsylvania. See Glanski v. Ervine, 409 A.2d 425 (Pa.Super.1979); LeDonne v. Kessler, 256 Pa.Super. 280, 389 A.2d 1123 (Pa.Super.1978); and Nat'l Bldg. Leasing, Inc. v. Byler, 252 Pa.Super. 370, 381 A.2d 963 (Pa.Super.1977)
 
 
 [29]
 Lance testified that his understanding of the Certain-teed representation was that Certain-teed would quote Cusco prices that were within one or two percent of the market price, regardless of the consequences to Certain-teed or prices quoted to other Certain-teed agents. Certain-teed claims that this is inconsistent with the claim in the original complaint that Cusco would be treated the same as all other Certain-teed agents. In addition, Certain-teed claims that it is relevant that Cusco omitted any mention of the alleged "keep competitive with the market" representation in its original complaint
 
 
 [30]
 Upon a trial of the issues raised by the pleadings, including the amended complaint, a complaint superseded thereby might well be offered in evidence by the defense if it contains material admissions by the plaintiffs named in the amended complaint. Such evidence would be admissible in order to enable the court to determine the facts upon the issues being tried
 Nisbet v. Van Tuyl, 224 F.2d 66, 71 (7th Cir. 1955). See also Loren Specialty Mfg. Co. v. Clark Mfg. Co., 241 F.Supp. 493, 500 (N.D.Ill.1965), aff'd, 360 F.2d 913 (7th Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 392, 17 L.Ed.2d 303 (1966); Wiseman v. Reposa, 463 F.2d 226, 227 (1st Cir. 1972) ("As a matter of pleading the original complaint had disappeared. As an admission against interest, it had not.").
 
 
 [31]
 Although the complaint is unverified, there is testimony that Potter prepared the complaint after speaking with Lance, and that Lance personally reviewed the complaint
 As stated in Nisbet, 224 F.2d at 71:
 Conversely, upon the trial, plaintiffs would be permitted to show by evidence the explanation, if any there be, as to why the facts relied on by defendants as admissions were stated in the amended complaint differently than the way in which they were stated in the original complaint.
 
 
 [32]
 Cusco argues that the district court improperly excluded the damage projections of plaintiff's expert witness, Dr. Roger Kormendi. On remand, Cusco is free to present expert testimony on damages, and the trial court is obligated to judge the admissibility of that testimony in light of Rules 702-705 of the Federal Rules of Evidence, governing expert testimony. Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury
 Cusco also argues that the trial court improperly failed to instruct the jury to award prejudgment interest on any damages awarded to or adjust past losses to current dollars. Cusco is free to present these arguments to the trial court on remand.
 Certain-teed also raises questions regarding proper jury instructions. Certain-teed's argument regarding the burden of proof for establishing an oral condition modifying the written contract is moot in light of our conclusion that the Pennsylvania parol evidence rule precludes admission of any testimony aimed at altering the integrated Sales Agents Agreement.
 Certain-teed's remaining argument regarding the correct standard for awarding punitive damages is properly addressed to the trial court on remand.