Leon STERN

v.

Malcolm BRICKLIN, John S. Shinn, Fastrack International, Inc., Fastrack Leisure Land, Inc., First Stroudsburg National Bank now known as the First National Bank of Eastern Pennsylvania, Francis R. Drake, Thomas H. Kiley, Joseph A. Lisicky, William R. Mainwaring and John Pentz.

Civ. A. No. 72–854.

United States District Court,
E. D. Pennsylvania.

Aug. 7, 1978.

 

Seymour I. Toll, Philadelphia, Pa., for plaintiff.

Joseph Neff Ewing, Jr., Philadelphia, Pa., for Shinn, Kiley, Drake, Lisicky, Mainwaring, Pentz and the Bank.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The plaintiff, Leon Stern, brought this diversity action against defendants Malcolm Bricklin, Fastrack International, Inc., and Fastrack Leisure Land, Inc., (Fastrack defendants), and defendants First Stroudsburg National Bank and five of the Bank's officers (Bank defendants), to recover damages for breach of contract, conversion of personal property, and conspiracy to commit conversion.[1] At trial the plaintiff asserted breach of contract and conversion claims against the Fastrack defendants; conversion against First Stroudsburg National Bank (Bank); and conspiracy against the Fastrack defendants, the Bank and the five Bank officers. A seventeen day trial was held before the Court and a jury. At the end of the plaintiff's case the Court directed a verdict in favor of all the defendants in connection with the plaintiff's conspiracy claims, and at the close of all the evidence the Court directed a verdict in favor of the Bank on the conversion claim. In connection with the plaintiff's claims against the Fastrack defendants, the jury answered special interrogatories,[2] as a result of which the Court entered a verdict in favor of the plaintiff on both the breach of contract and conversion claims in the amount of $2,388,080. The matter is now before the Court on the plaintiff's motion for a new trial against the Bank defendants on the claims of conspiracy and conversion.

It is well settled that on a motion for a directed verdict the evidence adduced by the plaintiff and all reasonable inferences to be drawn therefrom are to be viewed

---

1. The plaintiff also asserted claims of fraudulent inducement to contract against the Fastrack defendants, and conspiracy to make unjustly selective payments in fraud of the plaintiff and his creditors against all the defendants. The Court granted the defendants' motions for directed verdicts in connection with both these allegations, and those rulings are not questioned here.

2. The jury found that the Fastrack defendants breached their contractual obligations: 1) to pay certain personal debts of the plaintiff; 2) to employ him for a period of one year at the rate of $1000 per week; 3) to transfer to him a certain percentage of stock in Fastrack International, Inc. and Fastrack Leisure Land, Inc.; and 4) to return to him the securities which he pledged as collateral for an $125,000 loan from First Stroudsburg National Bank (including conversion of the collateral securities).

in a light most favorable to the plaintiff. *Sano v. Pennsylvania Railroad Company*, 282 F.2d 936 (3d Cir. 1960). On a motion for a new trial alleging the erroneous grant of a directed verdict, the plaintiff is also entitled to have the evidence viewed in the same favorable manner. *Clyde v. Hodge*, 460 F.2d 532 (3d Cir. 1972); *Wiggins v. City of Philadelphia*, 331 F.2d 521 (3d Cir. 1964).

Viewing the plaintiff's evidence and the inferences therefrom in a light most favorable to the plaintiff, the evidence can be summarized as follows. In 1970, the plaintiff became interested in acquiring a Poconos resort hotel called Vacation Valley. He negotiated an agreement to purchase it with Francis and John Shinn, and then formed two wholly owned corporations, Four Seasons Country Club, Inc. (Four Seasons), and LBGS, Inc. (LBGS), for the purpose of buying and operating the resort. [N.T. 2–104] Pursuant to their agreement, the Shinns' corporation transferred Vacation Valley to Four Seasons. [N.T. 2–134] The plaintiff arranged for Four Seasons and LBGS to borrow money from the Bank in order to pay for refurbishing the hotel and to finance the sale of some of the Vacation Valley land. At the same time he borrowed $125,000 from the Bank for his personal use. He signed a note in connection with this personal loan, and gave as collateral certain securities. [N.T. 2–138, 3–26] In addition to the money he borrowed from the Bank, the plaintiff also borrowed money from friends to use in running Vacation Valley. [N.T. 3–36]

Despite the plaintiff's efforts, Vacation Valley did not generate enough money to cover expenses, and Four Seasons and LBGS fell behind in their mortgage payments and payments due other creditors. When this happened, the plaintiff personally obligated himself to repay some of the debts of Four Seasons and LBGS. He also started looking for a buyer for Vacation Valley.

In early 1971, he met the defendant Malcolm Bricklin, who expressed an interest in purchasing Vacation Valley. The two men met on several occasions, and in late July 1971 they arrived at an agreement which the plaintiff outlined at trial as follows: 1) the plaintiff would exchange all his stock in Four Seasons and LBGS for $1.25 million worth of stock in Fastrack International, Inc. (International), and Fastrack Leisure Land, Inc. (Leisure Land); 2) the Fastrack defendants would repay all the debts of plaintiff; 3) the Fastrack defendants would return the securities that the plaintiff had given to the Bank as collateral for the $125,000 personal loan, which the plaintiff had obtained from the Bank; and 4) the Fastrack defendants would employ the plaintiff for one year at a salary of $1000 per week. [N.T. 3–152, 4–4, 4–65, 4–141]

In order to finance this transaction, a mortgage had to be arranged. [N.T. 4–8, 4–9] The plaintiff testified that he called the loan officer at the Bank who handled his accounts and told him that he had found a buyer for Vacation Valley, who would be contacting him shortly to arrange financing. [N.T. 4–9, 4–54, 4–99] The plaintiff testified that he was not involved in the negotiations which culminated in the mortgage agreement, and that the only action he took in furtherance of this transaction was to call the loan officer in order to introduce Malcolm Bricklin to the Bank. [N.T. 4–54, 4–134, 7–21, 7–104, 8–15]

In September 1971 a Bank meeting was held which was attended by the plaintiff, the defendant Malcolm Bricklin, and the five Bank officers named as defendants in this action. The plaintiff testified that Malcolm Bricklin spoke at this meeting for about twenty minutes and outlined the provisions of their July 1971 agreement. [N.T. 4–104]

The closing for Vacation Valley was held on or about November 22, 1971. At the closing the plaintiff executed documents transferring Vacation Valley from Four Seasons to Leisure Land, the Bank loaned Leisure Land $1.25 million pursuant to its mortgage agreement, and the debts the plaintiff and his corporations owed the Bank were satisfied out of the mortgage proceeds. [N.T. 4–149, 5–20, 8–115] The plaintiff testified that one of the Bank's

conditions for the mortgage was the repayment of the plaintiff's corporate and personal loans to the Bank. [N.T. 8–117]

At the November 22, 1971 closing Malcolm Bricklin gave the plaintiff a contract to sign which was intended to embody their July 1971 agreement. The plaintiff refused to sign it on the ground that it did not provide for the return of his collateral securities or for the assumption of his debts. [N.T. 6–8] Bricklin told him that he would send him another contract, but according to the plaintiff this was never done, and therefore a written contract was never executed by them.

In January 1972 the Bank gave the securities it held as collateral to the Fastrack defendants. [N.T. 11–109] The back of the plaintiff's note reflects that an assignment of the note was made to the Fastrack defendants by the Bank. [N.T. 11–109] The plaintiff's signature does not appear on the back of this note, and the plaintiff testified that prior to the commencement of this lawsuit in the spring of 1972, he never saw the writing which now appears on the back of the note. [N.T. 3–27]

In his motion for a new trial the plaintiff first contends that he presented sufficient evidence that there was a conspiracy among all the defendants to convert his collateral securities.[3] As the Pennsylvania Supreme Court stated in *Fife v. Great Atlantic & Pacific Tea Company*, 356 Pa. 265, 267, 52 A.2d 24, 27 (1947), the leading case on civil conspiracy in Pennsylvania:

> Conspiracy is a combination or agreement between two or more persons to do an unlawful thing, or to do a lawful thing in an unlawful manner. There must be a common purpose supported by a concerted action, and each must have the intent to do the unlawful thing. That intent must be common to all, and each must understand that the other has that purpose. A conspiracy may be proved by acts and circumstances sufficient to warrant an inference that the unlawful combination had been in point of fact formed

for the purpose charged. *Ballantine v. Cummings*, 220 Pa. 621, 70 A. 546 (1908).

While conspiracy may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory. The mere fact that several parties happened to exercise independent rights at or about the same time does not constitute an actionable conspiracy. Mere suspicion or the possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent with innocence.

■ Thus, in order to establish civil conspiracy under Pennsylvania law, the evidence in this case, viewed in a light most favorable to the plaintiff, must show that the defendants had a common purpose supported by concerted action with each having the intent to do an unlawful thing. Upon a review of the evidence, this Court finds, as it did at trial, that there is insufficient evidence to establish that the defendants had a common purpose supported by concerted action with each having the intent to do an unlawful thing.

The evidence shows that the Bank defendants were informed of the plaintiff's July 1971 oral agreement with Malcolm Bricklin. The July 1971 agreement provided that the Fastrack defendants would pay off the plaintiff's debts and that the Fastrack defendants would return the plaintiff's collateral to him. Thus, when the Bank defendants delivered the plaintiff's collateral to the Fastrack defendants, they were acting pursuant to the July 1971 agreement, which as testified by the plaintiff required the Fastrack defendants to deliver the collateral to him. There was no evidence showing that the Bank defendants conspired to give the plaintiff's securities to the Fastrack defendants, knowing that the Fastrack defendants did not intend to deliver the collateral securities to the plaintiff.

Thus, upon reviewing and considering the evidence in a light most favorable to the plaintiff, giving him the benefit of every fact and inference which may reasonably be

---

**3.** The parties agree that the law of Pennsylvania is applicable in this diversity action in view

of the fact that the transactions at issue in this litigation occurred in Pennsylvania.

deduced therefrom, the Court finds that there was not sufficient evidence upon which the jury could find a verdict for the plaintiff on the conspiracy allegation. As the Supreme Court stated in *Brady v. Southern Railroad*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943):

> When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by . . . directed verdict . . . .

In the instant case, without weighing the credibility of the witnesses, and viewing the evidence in the light most favorable to the plaintiff, the only verdict which the jury could reasonably find on the conspiracy issue would have been a verdict for the defendants.

■ The plaintiff also moves for a new trial against the Bank on the ground that the evidence was sufficient for the jury to find that the Bank converted the plaintiff's collateral securities by delivering them to the Fastrack defendants. A conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification. *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 197 A.2d 721 (1964). Conversion requires proof that the defendant interfered, without lawful justification, with a plaintiff's right of property in a particular asset. The definition of conversion under Pennsylvania law as set forth in *Stevenson, supra*, was adopted by our Third Circuit in *Welded Tube Company of America v. Phoenix Steel Corporation*, 512 F.2d 342, 345 (3d Cir. 1975). As stated in *Welded Tube*:

> The Pennsylvania courts define conversion as the deprivation of another's right of property in, or use or possession of, a chattel without the owner's consent and without legal justification. *Stevenson v. Economy Bank of Ambridge*, 413 Pa. 442, 197 A.2d 721 (1964).

■ The Bank was required by Pennsylvania law, in the absence of an agreement to the contrary, to deliver the collateral to the party paying off the note. *Beaver Trust Company v. Morgan*, 259 Pa. 567, 103 A. 367 (1918); *Andrews v. Marine National Bank of Erie*, 153 Pa.Super. 149, 33 A.2d 75 (1943). Moreover, the note itself provided:

> It is further agreed that upon any transfer of this note, the said Bank may deliver the said collateral or any part thereof to the transferee who shall thereupon become vested with all the powers and rights hereinabove given to the said Bank in respect to said note and collateral and the said Bank shall be thereafter forever relieved and fully discharged from any liability or responsibility in connection therewith.

The evidence shows that the plaintiff's note was paid off at the November 22, 1971 settlement out of the proceeds of the Bank's mortgage loan to Leisure Land, one of the Fastrack defendants, and that the collateral was delivered by the Bank to the Fastrack defendants. The note which the plaintiff placed in evidence reflects that it was assigned to the Fastrack defendants by the Bank, and as heretofore pointed out, the note specifically provided that "the said Bank may deliver the said collateral . . . to the transferee." There was no evidence showing any agreement to the contrary concerning the collateral.

■ Having reviewed the evidence in a light most favorable to the plaintiff, the Court finds that there was insufficient evidence for the jury to find that the Bank converted the plaintiff's collateral securities by delivering them to the party who paid off the plaintiff's note. Without weighing the credibility of the witnesses, we conclude that the only verdict which the jury could reasonably have found on the issue of whether the Bank converted the plaintiff's collateral would have been a verdict for the defendant Bank.

Accordingly, the Court will enter an order, denying the plaintiff's motion for a new trial against the Bank defendants.