**ALLSTATE INSURANCE COMPANY, Plaintiff,**

v.

**A.M. PUGH ASSOCIATES, INC. and Louis and Jeanne Pugh, Defendants.**

Civ. No. 81–0540.

United States District Court, M.D. Pennsylvania.

June 29, 1984.

Harvey Freedenberg, McNees, Wallace & Nurick, Harrisburg, Pa., William B. Somerville, Howard G. Goldberg, Smith, Somerville & Case, Baltimore, Md., for plaintiff.

Theodore L. Krohn, Krohn & Alcaro, Wilkes-Barre, Pa., for A.M. Pugh Associates, Inc. and Louis Pugh, Jr. and Jeanne A. Pugh.

Linus E. Fenicle, Enrico & Fenicle, P.C., Harrisburg, Pa., Joseph F. Saporito, Pittston, Pa., for James F. Rittenhouse.

Jay J. Gurfein, New York City, for Eugene L. Kass.

Larry S. Keiser, Nogi, O'Malley, Harris & Schneider, Wilkes-Barre, Pa., for Andrew Newell.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

Plaintiff, Allstate Insurance Company (Allstate), had issued performance bonds and payment bonds on behalf of defendant, A.M. Pugh Associates, Inc. (Pugh Associates), for certain construction projects to be performed by Pugh Associates. Allstate contends that Andrew Newell, an Allstate employee, received monetary bribes in exchange for approving these bonds. Defendant Louis Pugh, Jr., both individually and on behalf of Pugh Associates, and National U.S. Constructors, Inc. and defendant Jeanne A. Pugh, Mr. Pugh's wife, prior to the issuance of the bonds, executed an agreement of indemnity in favor of Allstate. When Pugh Associates defaulted on certain projects covered by the bonds, Allstate was required to expend significant amounts not only to pay past claims of subcontractors and materialmen but also to complete these projects. In this action, Allstate, asserting diversity jurisdiction under 28 U.S.C. § 1332(c)(1) and also invoking the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, et seq., seeks to recover compensatory damages of $4,034,657.78, consisting of payments of $1,005,616.73 on the performance bonds and $3,029,041.05 on the payment bonds. Liability is predicated on the indemnity agreement, on fraud and conspiracy to defraud, and on the provisions of RICO. Plaintiff also requests punitive damages on the fraud claim and treble damages under RICO against Pugh Associates and Louis Pugh, Jr. The claims against National U.S. Constructors, Inc. and Jeanne A. Pugh are bottomed solely on the indemnity agreement. After considerable discovery and several pretrial conferences, the case proceeded to trial without a jury on May 21, 1984. The trial lasted but

one day as defendants Louis Pugh, Jr. and Jeanne A. Pugh did not appear. Their counsel, however, in recognition of an obligation to his clients for whom he had entered an appearance, appeared and offered a defense.[1] Plaintiff's factual assertions were largely undisputed including the amounts claimed under the indemnity agreement, although defense counsel argued against any finding of liability under the fraud and RICO counts because (a) there was no evidence in the record showing personal gain by defendants; (b) there was no showing that Allstate, through its agent, Andrew Newell, would not have written bonds for Pugh Associates even if there had been no bribes paid to him; and (c) four of the five bonds were written by Allstate before the first bribe to Newell. The findings of fact by the court follow.

## FINDINGS OF FACT

1. Allstate is an Illinois corporation with its principal place of business in Northbrook, Illinois. Allstate is in the business of providing insurance coverage to both individuals and businesses throughout the United States. In addition to offering insurance coverage, Allstate has engaged in the business of offering contract bonds to persons, firms and corporations, including construction companies.

2. A.M. Pugh Associates, Inc., one of the defendants, is a New York Corporation with its principal place of business in Kingston, Pennsylvania.

3. Louis Pugh, Jr., one of the defendants, is a Pennsylvania citizen. His wife, Jeanne A. Pugh, also a defendant, was a Pennsylvania citizen when this action was instituted.

4. "Pugh Associates" was formed in 1976 by Louis Pugh, Jr. Prior thereto, Pugh was the owner of other general contracting companies, L. Pugh Constructors of Florida, Inc. and National U.S. Constructors, Inc.

---

**1.** The other defendants in this case and in a related action, 81–0675, *viz.,* Andrew Newell, Eugene L. Kass, Eastern Seaboard Constructors,

Inc., James F. Rittenhouse and Karen M. Rittenhouse, entered into settlement agreements with Allstate and are no longer parties.

5. In 1973 or 1974, National U.S. Constructors bid on a municipal sewer project in Harvey's Lake, Pennsylvania. After being awarded the contract, Pugh learned that his successful bid was approximately $600,000.00 lower than the bid of the second bidder. After failing in his effort to have the municipal authority reconsider his bid at a higher amount, Pugh, with the assistance of one Noel Laffan, a broker of surety bonds, decided upon an alternate means of recouping the losses caused by his own error. The plan involved subcontracting a substantial amount of work to a company near bankruptcy and having that subcontractor obtain a performance bond and a payment bond naming Pugh's company as the obligee. Thereafter, the subcontractor would declare bankruptcy and would default on its subcontract enabling Pugh's company to assert a claim against the surety company under the subcontractor's performance bond. The proceeds of the payment from the bonding company would be used in part to retain another subcontractor to complete the work on the project with the remainder of the monies to be shared by Pugh and others.

6. In November, 1974, Pugh's company, National U.S. Constructors, Inc., entered into a subcontract with Alagia Masons (Alagia), pursuant to which Alagia was to perform the masonry work on the Harvey's Lake project. Shortly thereafter, Alagia declared bankruptcy and defaulted on its subcontract with Pugh's company. Pugh filed a claim against Alagia's performance bond and, in July 1975, Pugh received $275,000.00 from the United States Fidelity and Guaranty Company (USF & G), the surety for Alagia, whose bond had been procured with the help of Laffan. According to Pugh, the mastermind of this activity was Noel Laffan. After he received the money from USF & G, Pugh had a company known as Somerset Valley Construction Company complete the work of Alagia Masons. Before Alagia ceased operations, it entered into a subcontract with a corporation known as Heller Mechanical Contractors, a New York corporation formed by Morton Heller, another employee of Pugh; Cumberland Bay Leasing Company, a company owned by Pugh; and Somerset Valley Construction Company. After Alagia's demise, each made claim upon Alagia's payment bond and received $13,800.00, $2,400.00, and $50,000.00 respectively.

7. In September 1975, Pugh's company, National U.S. Constructors, Inc., began work on a sewerage treatment plant for the city of Hartford, Vermont. On that project, Pugh was bonded by the Maryland Casualty Company. After the project experienced financial difficulty, Pugh signed a subcontract for the mechanical portion of the work to Heller Mechanical Contractors, Inc. Morton Heller had again departed his employment with Pugh to mobilize this company. Another principal in Heller Mechanical was James Rittenhouse, Pugh's brother-in-law, who had also been employed by Pugh's firm before going to work for Heller Mechanical. The National U.S. Constructors-Heller Mechanical subcontract was let for an amount greater than the anticipated or actual cost of the work contemplated by that subcontract in order to get money out of National U.S. Constructors. The excess monies were collected by Heller and, subsequently, were circulated through Heller Mechanical Contractors, Inc. back to Pugh Associates. Heller Mechanical thereafter filed a substantial claim against Maryland Casualty Company based upon its payment bond on the ground that it was owed monies.

8. In addition to entering into a fraudulent subcontract with Heller, Pugh, knowing that the job was going bad, decided he had to do everything in his power to protect himself and his companies from default as claimed by the bonding company. On a construction project, a contractor such as Pugh employs a number of subcontractors and purchases materials or equipment from a number of vendors. Upon receipt of partial requisition payments from the owner, the contractor should disburse monies to its subcontractors in payment for their portion of the work and to vendors for the portion of the equipment supplied by those respective vendors.

On the Harvey's Lake project, Pugh collected substantial monies but failed to pay subcontractors and vendors, instead diverting the payments to his own purposes and uses. The money was withdrawn from the construction company, causing it to become insolvent. One of the ways that the money was withdrawn was by making excess payments to Heller Mechanical. The subcontractors and vendors then made claim against Maryland Casualty Company, who was required under the terms of its payment bond to pay those claimants.

9. Pugh's first known involvement with Allstate occurred some time in 1975 during a meeting in New York City at the offices of United Coverage, an insurance agency operated by individuals named Al Mack and Howard Meyer. Prior to the meeting, Pugh had posted a $40,000.00 certified check with the State of New York in lieu of posting a bid bond on a highway project known as the Saranac Lake Project. After being awarded the contract, Pugh approached Maryland Casualty Company about providing payment and performance bonds on the project. Maryland Casualty Company refused to write the bonds. Pugh then approached Noel Laffan, his bond agent, about obtaining bonds from other sources. Laffan told Pugh that bonds could be arranged if Pugh made a "payoff" in addition to the normal bond premium.

10. Based upon the statement of Laffan, Pugh had made a secret "under the table" payment of $20,000.00 in cash to Messrs. Mack and Meyer in order to guarantee the availability of a bond from Allstate. Kass, Pugh's accountant, understood from Pugh that it was to go to Robert Throckmorton, then national bond manager for Allstate. Pugh, however, did not know from personal knowledge whether any Allstate employee actually received any portion of that payment.

11. In attendance at the first meeting with Allstate were Throckmorton and Andrew Newell, then an employee of Allstate in its regional office in Huntington Station, New York. As of the date of that initial meeting, Pugh Associates had not yet been formed and Pugh was still operating under the corporate name of National U.S. Constructors, Inc. Pugh's purpose for that meeting was the procurement of a bid bond from Allstate on behalf of National U.S. Constructors, Inc., as principal, for the Saranac Lake project.

12. In 1976, A.M. Pugh Associates, Inc. was formed. Thereafter, a bond was issued by Allstate on behalf of Pugh Associates on the Saranac Lake project. Although the bid was submitted to National U.S. Constructors, Inc., it was awarded to A.M. Pugh.

13. Subsequent to that initial meeting, Newell became Pugh's liason with Allstate, thereafter handling the Pugh accounts.

14. On September 30, 1976, an Agreement of Indemnity in favor of Allstate was executed by Louis Pugh, Jr., both individually and on behalf of A.M. Pugh Associates, Inc. and by Mr. Pugh's wife, Jeanne A. Pugh. The Agreement was executed in consideration of the issuance by Allstate of an indeterminate number of performance bonds and payment bonds naming Pugh Associates as the principal. The Agreement provided in pertinent part:

INDEMNITY. The Principal and the Indemnitors shall at all times exonerate, indemnify and keep indemnified Allstate and hold it harmless from any and all liability for losses, cost, damages, attorneys' fees and expenses of whatever kind including, but not limited to, those which Allstate may sustain or incur by reason of having executed or procured the execution of said Bonds, or any renewal, continuation, extension or successor thereof, and all other Bonds heretofore or hereafter executed or procured for or at the request of the Principal, and which Allstate may sustain or incur in making any investigation, in defending or prosecuting any actions, suits or other proceedings which may be brought under on in connection therewith, or in recovering or attempting to recover salvage or any unpaid premiums for said Bonds, in obtaining or attempting to obtain release

from liability, or in enforcing any of the covenants of this Agreement; it is further agreed that in any accounting which may be had between Allstate, the Principal and the Indemnitors, Allstate shall be entitled to charge for any disbursements made by Allstate in good faith in and about the matters herein contemplated by this Agreement or Indemnity, under the belief that it is or was liable for the sum or amounts so disbursed, or that it was necessary or expedient to make such disbursement to reduce, minimize or prevent any increase in the loss anticipated by and through Allstate's investigation, whether or not such liability, necessity or expediency existed, and that the vouchers or evidence of any such payments made by Allstate will be prima facie evidence of the fact and amount of the Principal's and the Indemnitor's liability to Allstate; the Principal and the Indemnitors agree to pay over, reimburse and make good to Allstate, its successors or assigns, all money which Allstate or its representatives shall pay, or cause to be paid or become liable to pay, by reason of the execution of said Bonds, and any renewal, continuance, extension or successor thereof, and all other Bonds heretofore or hereafter executed or produced for or at the request executed or produced for or at the request of the Principal; and such payment shall be made to Allstate as soon as it shall become liable therefor, whether Allstate shall have paid out such sum or any part thereof, or not.

RESERVE FOR LOSS. If for any reason Allstate shall deem it necessary to set up a reserve to cover any contingent claim, loss, costs, attorneys' fees, disbursements or expenses in connection with any of said Bonds by reason of default of the Principal, abandonment of contract, liens filed, unpaid and past due bills, dispute with the owner or obligee, or for any reason whatsoever, and regardless of any proceedings contemplated or taken by the Principal or the pendency of any appeal, the Principal and Indemnitors jointly and severally covenant and agree, immediately upon demand, to deposit with Allstate, in current funds, an amount sufficient to cover such reserve and any increase thereof such funds to be held by Allstate as collateral, in addition to the indemnity afforded by this instrument, with the right to use such funds or any part thereof, any time, in payment or compromise of any judgment, claim, loss, damage, attorneys' fees, and disbursement or other expenses; and if Allstate is required to enforce performance of this covenant by action at law or in equity, the costs, charges, and expense, including attorneys' fees, which it may thereby incur, shall be included in such action and paid by the Principal and the Indemnitors. (Demand shall be sufficient if sent by registered mail to the Principal and the Indemnitors at the address given herein or last known to Allstate, whether or not actually received.)

ALLSTATE OBTAINING DISCHARGE. That, Allstate may, at any time hereafter, without releasing or discharging the Principal and the Indemnitors from any claim, demand, action, costs or any other expense heretofore incurred or accrued, take such action as it might deem necessary or proper to obtain its release from any and all liability under the said Bonds, and the Principal and the Indemnitors further agree that they shall further secure and indemnify Allstate against any and all charges, liabilities and expenses of whatever nature which Allstate may sustain or incur or be put to in obtaining such release.

TAKEOVER. In the event of any breach, delay or default asserted by the Obligee in any of said Bonds or failure by Principal to perform such bonded contracts or to pay obligations incurred thereunder, or in the event of Principal's death, disappearance, conviction of a felony, imprisonment, incompetency, insolvency [sic], or bankruptcy, or the appointment of a receiver, assignment or for benefit of creditors or any action taken by or against the Principal under

the National Bankruptcy Act or state insolvency laws, Allstate shall have the right, at its option, and is hereby authorized, but not required, to take possession of any part or all of the work under any contract covered by any said Bonds, and at the expense of the Indemnitors to complete or arrange for the completion of same and the Indemnitors shall promptly, demand, pay to Allstate all losses and expenses so incurred.

ASSIGNMENT. The Principal, the Indemnitors hereby consenting, will assign, transfer and convey to Allstate and does hereby assign, transfer and convey to Allstate, as collateral to secure the obligations in any and all of the paragraphs of this Agreement of Indemnity, and any other indebtedness and liabilities of the Principal and the Indemnitors to Allstate, whether heretofore or hereafter incurred, the assignment of this case of each contract to become effective as of the date of the ond covering such contract, but only in event of any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any such Bonds: (a) all of their rights under the contract, including their right, title and interest in and to, (1) all subcontracts let in connection therewith and such subcontractors' surety bonds, (2) all machinery, plant, equipment, tools and materials which shall be upon the site of the work or elsewhere for the purposes of the contract, including all materials ordered for the contract, and of any and all sums due or which may thereafter become due under such contract and all sums due or to become due on which the Principal or Indemnitors have an interest, and the Indemnitors and and Principal hereby authorize Allstate to endorse in the name of the Payee and to collect any check, draft, warrant or other instrument made or issued in payment of any such sum, deferred payment or retained percentages, and to disburse the proceeds thereof.

15. In 1978, Newell was transferred to Allstate's home office in Northbrook, Illinois, a community near Chicago, and in early 1979 was promoted to the position of Senior Bond Manager for Allstate, succeeding Robert Throckmorton. In this capacity, Newell had final decision-making authority regarding all surety bonds issued by Allstate, including those issued on behalf of Pugh. Upon Newell's promotion to the home office, Eugene Hessian, an Allstate employee in the Huntington Station office, was promoted to Newell's former position as the underwriter in charge of contract bonds in the Huntington Station office. Pugh dealt directly with Newell in the Allstate home office with regard to Pugh Associates' bonds.

16. From September, 1976 through the end of 1978, Pugh Associates received continued bonding from Allstate. Pugh Associates performed work in two principal geographical areas—western Pennsylvania and the Norfolk-Newport News, Virginia area. In late 1978 or early 1979, Pugh Associates was experiencing severe financial difficulties as a result of several unprofitable projects then in progress. Eugene L. Kass (Kass), the accountant for Pugh Associates, advised Pugh that the deteriorating financial condition of Pugh Associates was jeopardizing Pugh's ability to continue to receive bonding from Allstate.

17. At about this time, Pugh had become aware that Newell was acutely dissatisfied with life in Illinois and especially with the climatological conditions of the upper Midwest.

18. In November 1978, Pugh contacted Newell and arranged for Newell and Newell's wife Rita to accompany him on an all expense paid trip to Las Vegas, Nevada. Thereafter, Pugh, Pugh's son, Newell and Rita Newell went to Las Vegas all at Pugh's expense.

19. By the spring of 1979, Newell was becoming more specific with regard to his plans for leaving Allstate. Newell confided to Pugh that he desired to leave Illinois to purchase and operate a motel in a state with a more temperate climate. Pugh, concerned that his company would lose its source of bonding during this period of

acute financial distress, traveled to Chicago, met with Newell, and attempted to give Newell $10,000.00 in cash to induce Newell to continue to remain employed with Allstate and continue to write bonds for Pugh Associates. Newell refused the offer.

20. On March 23, 1979, Pugh traveled again to Chicago, met Newell and again offered Newell an envelope containing $10,000.00 in cash, ostensibly as expense money to enable Newell to conduct a search for a suitable motel for Pugh to purchase. Pugh intended that he and Newell would become partners in the motel business, although he admitted that the issuance of continuing bonding played a part in making the payment. On this occasion, Newell accepted the payment. Newell did not, however, begin a search for a motel after receiving the money.

21. The money used for the payment was taken from either Pugh Associates or Eastern Seaboard, another company controlled by Pugh, and further weakened the financial condition of those companies.

22. At the time he accepted this cash payment from Pugh and the trip to Las Vegas, Newell was aware that his acceptance of the money was in direct contravention of express policies promulgated by Allstate. That policy prohibited the acceptance by an Allstate employee of anything of value from any person who had a business relationship with that company.

23. Although Pugh and Newell both described this and other payments as "loans" toward the purchase of a motel which they intended to operate in partnership, both admitted that no promissory notes or other evidence of indebtedness were ever executed by Newell and that none of the so-called loans were repaid in part or in whole.

24. Prior to March, 1979, Somerset Valley Construction Company ("Somerset Valley"), which had served as Pugh's subcontractor on the project at Harvey's Lake after Alagia Masons' default and another one of Kass' accounting clients, applied for bonding with Allstate. Newell declined to write the account. Since Somerset Valley could not obtain bonding, it could not work as the prime contractor on federal or state funded projects. The owner of that firm was one Oscar Renda.

25. Thereafter, Pugh and Renda agreed that Pugh's company would obtain contracts which were to be performed by one or another of Renda's companies. The contracts would be obtained in the name of either Pugh Associates or Eastern Seaboard. Allstate would be used to provide payment and performance bonds. In return for obtaining the bonds, Pugh would receive a two percent fee based upon the total value of the respective contracts. Thus, Renda's function was to do the work and Pugh's was to procure the bonds.

26. Within three weeks of the first cash payoff to Newell, Pugh Associates bid on and was awarded a project in Cape St. Clair, Maryland and Eastern Seaboard was awarded a project at Newport Township, Pennsylvania, both on behalf of Somerset Valley.

27. When Pugh told Newell about the bids, Newell questioned why Pugh would bid on sewer projects in which he had no expertise. Pugh explained his arrangement with Somerset Valley and that with the additional money generated from the Somerset Valley arrangement, Pugh could provide additional funds for the motel. Pugh agreed to pay Newell twenty five percent of Pugh's payment, i.e., one-half of one percent of the Somerset Valley contract price, which came to approximately twenty-five thousand dollars per job. Based on that arrangement, Newell agreed to write the first so-called "Somerset Valley" bond for the Cape St. Clair project.

28. On July 23, 1979, Pugh went to meet Newell in Mt. Prospect, Illinois and delivered $24,600.00, which represented the payment for the first Somerset Valley project.

29. Thereafter, on August 6, 1979, Newell wrote a second bond for the Newport Township project.

30. By the fall of 1979, Newell was actively looking for motels, first in the Texas gulf area and then in the southern

Florida area. On September 20, 1979, two days before the payment for the Newport Township bond, Newell went to Fort Meyer, Florida to inspect a motel.

31. On September 22 or 23, 1979, Newell met Pugh at Pugh's office in Kingston, Pennsylvania. At that meeting, Pugh gave Newell $25,000.00, again in cash, this time for the Newport Township bond.

32. The true identity of the general contractor on these projects, Somerset Valley, was disguised from both the owners and from other Allstate employees. Pugh authorized Renda to represent himself to the owners of the project as an officer of Pugh Associates. As to Allstate, when Hessian wrote to Rittenhouse inquiring as to whether the work on these projects was being performed by Pugh Associates or by some other firm, he was advised by Rittenhouse that all of the work was performed by Pugh Associates.

33. The payments by Pugh to Newell further weakened Pugh Associates' financial condition, and Pugh was concerned that he might not be able to raise the additional money necessary to purchase the motel. In order to recoup the money paid to Newell and to raise additional funds, Pugh, Kass and Noel Laffan entered into a further arrangement to broker Allstate bonds to companies who could not themselves procure bonds. To put this scheme into effect, Pugh, Kass and Laffan met in Pennsylvania in the fall of 1979. At that meeting, the four agreed that Laffan would locate the companies which required bonds. Allstate was identified as the source of the bonds. They further agreed that the payoff from the customers would be split four ways, ¼ to Kass, ¼ to Laffan, ¼ to Eugene Hessian, another Allstate employee who reported to Newell, and who as has been pointed out, had assumed Newell's position as Regional Bond Manager in the Huntington Station, New York office; and ¼ split between Pugh and James Rittenhouse.

34. One of the accounts which Laffan suggested during the Pennsylvania meeting, was a company known as Fred Wendel Company. Pursuant to the scheme, the Wendel account was submitted to Hessian in the Huntington Station office. Hessian approved the account and submitted it to Newell in the home office for final review. On November 30, 1979, Newell disapproved the account and advised Hessian that the account would not be approved until after receipt and review of Wendel's 1979 year end figures.

35. Hessian advised Mr. Wendel that bonding had not been approved and that Allstate required the December 31, 1979 financial data. On December 4, 1979, Mr. Wendel called Newell while Hessian and Newell were in a motel in Pennsylvania. In that conversation, Wendel threatened to reveal the Pugh-Newell payoffs (about which he had apparently learned from some unknown source) to Allstate officials unless the necessary bond was issued. The bond was thereafter authorized by Newell on December 14, 1979.

36. As a result of the issuance of the bond, Wendel made a payoff in the amount of $25,000.00 and delivered the money to Rittenhouse. Hessian received $2,500.00. He believed that the payoff was only $10,000.00 and his partners did not advise him that the real amount was $25,000.00. Rittenhouse and/or Pugh received the rest of the funds, which were laundered through the account of an entity known as American Consulting, Ltd., another entity controlled by Pugh.

37. Another bonding account written by Allstate involved a firm named Unity Electric, which had previously been unable to procure a bond. Unity Electric had been first introduced to Kass by Laffan. Unity Electric made a payoff of $12,000.00 for its bond. The money was paid to Kass, who deposited the money in an account called AC Trading Co. Hessian received $2,700.00, Kass $300.00 (for laundering Hessian's money) and American Consulting, Ltd. received $9,000.00. American Consulting, Ltd. paid Rittenhouse $6,000.00 in January, 1980.

38. In November 1979, Pugh and Newell met in Chicago, Illinois. Newell was

very insistent that a motel be purchased. Pugh had submitted a bid on a motel in Daytona Beach, Florida, known as the Talisman Motel. The bid had not been accepted. Another bid was submitted on a motel called the Desert Isle. At the Chicago meeting, Newell told Pugh that he wanted "to see the stock of the motel on the top of [his] Christmas Tree", meaning that he wanted a motel by the end of 1979. Pugh concluded that he "couldn't stall [Newell] any longer," and understood Newell to mean that unless the motel was purchased, Pugh would not get any more bonds.

39. On December 3, 1979, Pugh made a $20,000.00 deposit on a motel in Daytona Beach, Florida called the Hi Seas Motel. Thereafter, he formed a corporation called the Hi Seas Corporation. Pugh kept one half of the stock and placed the other one half in the name of Rita Newell, Andrew Newell's wife. On December 29, 1979, the motel purchase was closed. At that time, Hi Seas Corporation purchased the motel for $1,900,000.00, paying $350,000.00 in cash and financing the balance. Newell paid nothing for his wife's half interest in the motel. The $350,000.00 was taken out of Pugh Associates' accounts.

40. In late December, 1979, or the first week of January, 1980, Pugh was advised by Kass that one of Kass' clients, Olympic Construction Company ("Olympic"), was in need of bonding. Olympic had previously applied for bonding to Allstate and had been refused.

41. On January 3, 1980, Pugh, Rittenhouse and Kass went to 4407 W. Street, Washington, D.C. to meet with representatives of Olympic. Pugh was unaware that the address in question was wired for video and sound by the Federal Bureau of Investigation.

42. At the meeting, the persons discussed various alternative schemes. One involved simply procuring bonds for Olympic as had been done for Unity and Wendel. Another involved merging Olympic into Pugh Associates, putting substantial additional business on the books of the combined companies (as much as $40 million)

and then "pulling the plug" as Pugh had done to Maryland Casualty Company, *i.e.*, taking monies out of a company immediately prior to or during the course of going into default with the intention of transferring those monies to himself or some other person, firm or corporation which is not entitled to the monies.

43. While at the meeting, Pugh called Newell, who was then at his office in Chicago. By use of a prearranged code, Newell then returned the call from a pay telephone in the Allstate building.

44. Shortly after the meeting in Washington, Pugh was advised that he was one of the subjects of a federal investigation.

45. Thereafter, Pugh Associates became insolvent. That firm defaulted on at least five major construction projects and left numerous suppliers and subcontractors unpaid.

46. The investigation conducted in Washington by the United States Attorney resulted in indictments against Pugh, Kass and Newell, charging each with conspiracy to defraud Allstate of the faithful and honest services of its employees. Pugh entered a guilty plea and was convicted.

47. From 1980 through 1982, Allstate received and processed numerous claims from unpaid subcontractors and materials suppliers pursuant to payment bonds which it had issued to Pugh Associates for nine projects. Ultimately, Allstate paid $2,923,196.85 in payment bond claims.

48. Similarly, Pugh's failure to complete performance on five of the projects bonded by Allstate caused Allstate to incur significant expenditures completing the work remaining on each of the defaulted projects.

49. On or about September 23, 1977, Pugh Associates had entered into a contract (N62470–76–C–6233) with the United States Government for the construction of a processing facility at the Fleet Combat Training Center in Dam Neck, Virginia. On or about October 3, 1977, Allstate had executed a performance bond and a payment bond naming Pugh Associates as the

principal for the aforesaid project. Thereafter, Pugh Associates began to perform under the contract with the government. By letter dated October 16, 1980, Alan Wallace, Vice President of Pugh Associates notified the government that Pugh Associates was incapable of completing its obligations under the contract. By letter dated November 10, 1980, the government terminated for default the contract with Pugh Associates effective retroactively to November 5, 1980. On or about February 19, 1981, a Takeover Agreement was executed between Allstate and the United States Government pursuant to which Allstate was to undertake the completion of the work begun by Pugh Associates on this project. On or about February 20, 1981, Allstate entered into a contract with Conrad Brothers, Inc. for the completion of the project. Allstate paid Conrad $75,478.10 for labor and materials provided for the completion of the project. The loss incurred by Allstate under its performance bond totalled $0.00. In addition, Allstate paid claims under the payment bond for this project in the aggregate amount of $831,584.25.

50. On or about November 11, 1977, Pugh Associates had entered into a contract (N62470–7–C–7497) with the United States Government for the construction of a squadron training building at the Naval Air Station, Oceana, in Virginia Beach, Virginia. On or about November 20, 1978, Allstate had issued a performance bond and a payment bond on behalf of Pugh Associates for this project. Pugh Associates was directed by the government to begin performance of this contract on December 5, 1978. By letter dated December 2, 1980, the government notified Allstate that the contract with Pugh Associates for this project had been terminated for default on November 25, 1980. On February 19, 1981, Allstate entered into a Takeover Agreement with the United States Government pursuant to which Allstate assumed responsibility under its performance bond for the completion of this project. On February 20, 1981, Allstate entered into a contract with Conrad Brothers, Inc. for the

completion of the work remaining on this project. Allstate paid Conrad Brothers, Inc. $361,592.09 for labor and materials supplied under the contract for the completion of the project. The loss incurred by Allstate under its performance bond totalled $199,039.09. In addition, Allstate paid claims under the payment bond for this project in the aggregate amount of $367,595.15.

51. On March 28, 1979, Pugh Associates had entered into a contract with the Commonwealth of Virginia for the construction of student housing on the campus of Old Dominion University in Norfolk, Virginia. On or about March 28, 1979, Allstate had issued a performance bond and a payment bond on behalf of Pugh Associates for this project. By letter dated October 31, 1980, Old Dominion University made demand upon Allstate that it take action pursuant to its performance bond to remedy the default of Pugh Associates on this project. On or about March 18, 1981, Allstate entered into an Agreement with Old Dominion University for the completion by Allstate of the work remaining on this project. Allstate paid L.J. Hoy, Inc. $1,843,561.00 for labor and materials supplied under their contract for the performance of the work on this project. The loss incurred by Allstate under its performance bond totalled $561,486.00. In addition, Allstate paid claims under the payment bond for this project in the aggregate amount of $736,296.60.

52. On or about June 19, 1979, Pugh Associates had entered into a contract with the United States Government for the construction of projectile magazines at the Naval Weapons Station in Yorktown, Virginia. On the same date, Allstate issued a performance bond and a payment bond on behalf of Pugh Associates for this project. The government directed Pugh Associates to begin performance under this contract on July 4, 1979. The government notified Allstate that the contract with A.M. Pugh Associates for this project had been terminated for default. On February 19, 1981, Allstate entered into a Takeover Agree-

ment with the United States Government pursuant to which Allstate assumed responsibility under its performance bond for the completion of this project. Allstate entered into a contract with Cochran Construction Company for the completion for the work remaining on this project. As of May 1, 1983, Allstate had paid Cochran $2,214,564.25 for labor and materials supplied in the performance of the work on this project. The loss incurred by Allstate under its performance bond totalled $75,-362.25. In addition, Allstate paid claims under the payment bond for this project in the aggregate amount of $523,781.69.

53. On or about February 8, 1980, Pugh Associates entered into a contract with the Hampton Roads Sanitation District for the construction of an influent pump station in Dam Neck, Virginia. By letter dated October 10, 1980, the Hampton Roads Sanitation District notified Pugh Associates and Allstate that the contract between the District and Pugh Associates would be terminated for default effective October 25, 1980. On or about January 16, 1981, Allstate entered into an Agreement with the Hampton Roads Sanitation District pursuant to which Allstate assumed responsibility under its performance bond for the completion of this project. On or about January 16, 1981, Allstate entered into a contract with J.B. Denny Company for the completion of the work remaining on this project. Allstate paid J.B. Denny Co. $1,940,427.95 for labor and materials supplied in the performance for the work of this project. The loss incurred by Allstate under its performance bond totalled $169,-729.39. In addition, Allstate paid claims under its payment bond for this project in the aggregate amount of $426,574.61.

54. In addition to payment bond claims on the five projects which Allstate was required to complete, it paid laborers, subcontractors and materialmen on other bonded projects a total of $143,208.75.

55. The loss sustained by Allstate on its performance bonds amounted to $1,005,-616.73 and on its payment bonds $3,029,-041.05, for a total loss of $4,034,657.78.

## DISCUSSION

Initially, the indemnity claim can be disposed of with little comment as the defendants did not deny the execution of the indemnity agreement or the fact that it was breached. Finally, the amounts allegedly expended by the plaintiff were not challenged.

■■■ The court must next make a determination as to the liability of Pugh on the fraud count. It is clear that in a case such as this, a surety may institute an action for fraud and conspiracy to defraud. *See Seaboard Surety Co. v. Permacrete Construction Corp.*, 221 F.2d 366 (3d Cir. 1955). Since the fraud claim is in federal court based on diversity jurisdiction, this court must look to applicable Pennsylvania law in determining whether fraud exists. The Pennsylvania Supreme Court in *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412 (1981), stated: "A fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Id.* at 143, 425 A.2d 412. In order to establish a claim of fraud the defendant must have made a false representation of a material fact that he knew was false and on which the plaintiff justifiably relied causing injury as a result of the reliance. *See Contractor Utility Sales Co. Inc. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1082 at n. 27 (7th Cir.1981).

■■■ It is a well established rule that nondisclosure or concealment of material facts amounts to culpable misrepresentation no less than an intentional false affirmation. *See Marian Bank v. International Harvester Credit Corp.*, 550 F.Supp. 456, 461 (E.D.Pa.1982), *aff'd*, 725 F.2d 668 (3d Cir.1983); *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983). In addition, in order for fraud to be proved, it is not necessary to establish the motive of personal gain. A

finding of fraud may be made without any-one in fact having derived any benefit or advantage from making the false representation. *See generally* 37 Am.Jur.2d. *Fraud and Deceit,* § 187 at 249 and § 18 at 42. The burden of proof for one attempting to establish that fraud existed is higher than the usual preponderance of the evidence standard. The Supreme Court of Pennsylvania has held that fraud or intent to defraud must be proved by "evidence that is clear, precise and convincing." *Snell v. Pennsylvania,* 490 Pa. 277, 416 A.2d 468 (1980). *See also Contractor Utility Sales Co. Inc. v. Certain-Teed Products Corp.,* 638 F.2d at 1082; *Delahanty v. First Pennsylvania Bank,* 464 A.2d at 1252–53.

In the case *sub judice,* it is apparent to the court that the elements necessary for a claim of fraud have been established. The defendant made a false representation of a material fact by failing to disclose the payment of the bribes themselves and the actual financial condition of Pugh Associates. It is beyond dispute that the defendant knew the representation was false or that the plaintiff would justifiably rely on the misrepresentation.

In opposing a finding of fraud, Pugh alleges there is no evidence in the record establishing personal gain by the defendants. As stated above, one may be guilty of fraud without in fact having derived any benefit or advantage from making the false representation. Additionally, since Pugh is the majority, if not the sole shareholder of Pugh Associates, it is evident he did personally benefit from the bribes as he drew a salary from the company and borrowed $350,000.00 from the company for the purchase of the motel. The defendant also argues that there was no showing that Allstate, through its agent, would not have written bonds for Pugh Associates even if there had been no bribes paid to them. It is not necessary that there be a direct statement by one of the Allstate's agents in order to make a finding of fraud. Fraud may be established not only by direct proof but also by circumstantial evidence. *See* 37 Am.Jur.2d. *Fraud and Deceit,* § 477 at 659. As the Fifth Circuit Court of Appeals in *Colonial Refrigerated Transportation, Inc. v. Mitchell,* 403 F.2d 541 (5th Cir.1968), explained: "What was in a man's mind may be determined not only by what he says he thought, by what he said and did. In law, as elsewhere, actions may speak louder than words." Facts such as Kass, Pugh's accountant, telling Pugh before the first bribe to Newell that Pugh Associates' financial condition would not justify further bonding, clearly permits the finder of fact to determine that the individual receiving the bribe would not have acted otherwise but for the receipt of the bribe. It is common sense to assume that one would not pay a bribe to another if the bribe were unnecessary in order to receive the requested benefit. Pugh's final contention, that since four of the five bonds were written by Allstate before the first bribe to Newell no fraud can be found, also must fail. It is clear that Newell, holding a supervisory position, would have the ability to cancel the project or make Pugh Associates perform according to the contract in precise terms. The identical contention espoused by Pugh was made in *Seaboard Surety Co. supra,* and rejected. The Third Circuit Court of Appeals explained that "here was the situation where had the facts become known the whole picture could have changed very rapidly." *Id.* at 376. Had the background of the issuance of the first bond been disclosed to honest Allstate employees, no subsequent bonds would have been issued and no losses would have been incurred by Allstate. Moreover, knowledge of the ongoing payoffs would no doubt have caused plaintiff to terminate this unscrupulous activity as promptly as possible. Therefore, it is clear that the plaintiff has carried its burden of establishing by clear, precise and convincing evidence the existence of fraud on the part of the defendant, Pugh.

The plaintiff also alleged the actions of defendants Pugh, Rittenhouse, Newell and Kass constituted a conspiracy

to defraud Allstate. Conspiracy, under Pennsylvania law, is "a combination or agreement between two or more persons to do an unlawful thing or to do a lawful thing in an unlawful manner. A conspiracy to defraud on the part of two or more persons means a common purpose supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each understands that the other has that purpose." *Ballantine v. Cummings*, 220 Pa. 621, 630, 70 A. 546 (1908) (citation omitted). *See also Stern v. Bricklin*, 455 F.Supp. 346, 349 (E.D.Pa.1978). The evidence in the record of meetings and of concerted actions of, *inter alia*, Rittenhouse, Newell, Kass and Pugh, amply demonstrate a knowing plan to defraud Allstate.

▮ In addition to compensatory damages, Allstate also requests an award of punitive damages. Under Pennsylvania law, an award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. Punitive damages are never awarded as a right, no matter how "outrageous" the defendant's conduct. *See Smith v. Wade*, 461 U.S. 30, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983).

▮ Pennsylvania courts have recognized the standards governing punitive damages set forth in § 908 of the Restatement of Torts (1939). *See Chambers v. Montgomery*, 411 Pa. 339, 344–445, 192 A.2d 355 (1963). The Pennsylvania Supreme Court in *Chambers*, quoting the Restatement of Torts § 908, has stated " 'Punitive Damages' are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct." *Id.* at 344, 192 A.2d 355. It further explained that, "[i]n determining whether punitive damages should be awarded, the act itself together with all the circumstances including the motive of the wrongdoer and the relations between the parties should be considered." *Id.* at 345, 192 A.2d 355. Therefore, conduct involving bad motive or reckless indifference may justify the special sanction of punitive

damages. *See Franklin Music Co. v. American Broadcasting Co., Inc.*, 616 F.2d 528, *Inc.*, 616 F.2d 528, 542 (3d Cir. 1980); *Delahanty v. First Pennsylvania Bank*, 464 A.2d at 1262–63. The purpose of punitive damages is both to punish the wrongdoer for past conduct and to deter both him and others from engaging in similar conduct in the future. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1277 (3d Cir.1979); *Delahanty v. First Pennsylvania Bank*, 464 A.2d at 1263.

▮ It is clear in this case that within the past ten years Pugh has admittedly defrauded three surety companies: United States Fidelity and Guaranty Company; Maryland Casualty Company; and Allstate Insurance Company. He has devised various schemes and has caused the companies enormous losses. It is clear that the conduct of Pugh falls within the bounds of being deemed "outrageous"—*i.e.*, "malicious", "wanton", "reckless", "willful", or "oppressive." *See Chambers v. Montgomery*, 411 Pa. at 344–45, 192 A.2d 355; *Delahanty v. First Pennsylvania Bank*, 464 A.2d at 1263 (where the court stated "it is difficult to picture a fact pattern which would support a finding of intentional fraud without providing proof of "outrageous conduct" to support an award of punitive damages.") An award of punitive damages is therefore clearly justified.

▮ In Pennsylvania, not only is the decision of whether to award punitive damages within the discretion of the fact finder but also within its discretion is the amount to be awarded. *Id.* In the case *sub judice*, while an award of punitive damages will be made, it will be minimal due to the extreme size of the compensatory award. It is the court's belief that to make an additional large award of punitive damages would serve no purpose as it appears that Mr. Pugh is not even in a position to pay such an award.

▮ Plaintiff's final allegation is that pursuant to 18 U.S.C. §§ 1962(c) and 1964(c), the anti-racketeering statute

(RICO), it is entitled to an award of "three-fold the damages [it] sustains." The statute provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Thus, there are several requirements in order to maintain a RICO claim: the activity involved must constitute "racketeering activity" pursuant to 18 U.S.C. § 1961(1); the defendant must be affiliated with an "enterprise" as defined in 18 U.S.C. § 1961(4), engaged in or affecting interstate commerce; and the enterprise must conduct its affairs through a "pattern of racketeering activity" pursuant to 18 U.S.C. § 1961(5). It is clear that this court's finding of fraud, resulting from Pugh's bribery of the Allstate employees, falls within the statute's definition of "racketeering." [2] It is also evident that the "pattern of racketeering activity" element, requiring at least two acts of racketeering activity within ten years, has been satisfied. *See United States v. Salvitti,* 451

F.Supp. 195, 199–200 (E.D.Pa.1978). The final requirement, that of an "enterprise," is more difficult to establish. An enterprise is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). There is a conflict existing in the federal courts concerning the proper scope of the "enterprise" element in RICO. The majority of courts, liberally construing the RICO statute, have found an enterprise to exist "where a group of individuals are associated solely because they jointly commit the predicate racketeering offenses under RICO." *See,* Comment, *Reading the "Enterprise" Element Back into RICO Sections 1962 and 1964(c),* 76 N.W.Univ.L. Rev. 100, 104 (1981). It is the opinion of other district courts within the circuit that the Third Circuit Court of Appeals would likely adopt such a broad reading of the statute. *See United States v. Mazzio,* 501 F.Supp. 340, 342 (E.D.Pa.1980) *aff'd* 681 F.2d 810 (3d Cir.1982); Comment, *supra,* at 104–06. A minority position, however, would narrowly confine an enterprise to a "pre-existing" economic association—*i.e.,* "an association having an ascertainable

---

**2.** 18 U.S.C. § 1961(1) provides:

"Raceteering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–94 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement),

section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving fraud connected with a case under title 11, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States.

structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts." *See United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir. 1980) *cert. denied* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 356.

 The findings of fact as determined by the court indicate that Pugh's arrangements with Newell, Laffan, Kass, Hessian and Rittenhouse, clearly constitute an "enterprise" within the broad definition of the statute. Additionally, since A.M. Pugh Associates was a pre-existing economic structure from which Pugh operated, the defendants' association would also fall within even the more narrow reading of the statute.[3] Therefore, the court finds a RICO violation has been made out and the plaintiff entitled to an award of treble damages.

## CONCLUSIONS OF LAW

1. The amount of compensatory damages claimed under the indemnity agreement was agreed on by counsel at trial to total $4,034,657.78.

2. The actions of Louis Pugh, Jr. and A.M. Pugh Associates, Inc. constitute a fraud upon Allstate.

3. Defendants Pugh, Pugh Associates and others, engaged in a conspiracy to defraud Allstate.

4. Allstate is entitled to recover punitive damages for Pugh's participation in the fraud against Allstate in the amount of $10,000.00.

5. Pugh's conduct demonstrates a violation of RICO, 18 U.S.C. § 1962(c), entitling Allstate to treble damages in the amount of $12,103,973.34.

6. Judgment is entered against Pugh and Pugh Associates in the amount of $12,-113,973.34.

**3.** Other elements of the RICO statute such as activity related to interstate commerce and cau-

sation are likewise sufficiently satisfied.